1   LAWYERS FOR CLEAN WATER, INC.
    Caroline Koch (Bar No. 266068)
2           Email: caroline@lawyersforcleanwater.com
    Drevet Hunt (Bar No. 240487)
3           Email: drev@lawyersforcleanwater.com
4   1004-A O'Reilly Avenue
    San Francisco, California 94129
5   Telephone: (415) 440-6520
    Facsimile:  (415) 440-4155
6
    *Attorneys for Plaintiff*
7   CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

8

9                    **UNITED STATES DISTRICT COURT**
                     **CENTRAL DISTRICT OF CALIFORNIA**
10

11  CALIFORNIA SPORTFISHING PROTECTION          Civil Case No.
    ALLIANCE, a California non-profit corporation;
12                                              **COMPLAINT FOR DECLARATORY AND**
                                                **INJUNCTIVE RELIEF AND CIVIL**
                Plaintiff,                      **PENALTIES**
13
            vs.
14
    SECURITY CONTRACTOR SERVICES, INC., a
15  California corporation; H&H PROPERTIES, a    **(Federal Water Pollution Control Act,**
    California limited liability company,        **33 U.S.C. §§ 1251 *et seq*.)**
16
                Defendants.
17

18

19

20

21

22

23

24

25

26

27

28

California Sportfishing Protection Alliance ("Plaintiff" or "CSPA"), by and through their counsel, hereby alleges:

**I.     JURISDICTION AND VENUE**

1.     This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.     On February 3, 2015, CSPA issued a sixty (60) day notice of intent to sue letter ("Notice Letter") to Security Contractor Services, Inc. and H&H Properties ("Defendants") for their violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollutant Discharge Elimination System (NPDES) General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ*) (hereinafter "Storm Water Permit") and the Clean Water Act. The Notice Letter informed Defendants of CSPA's intent to file suit against it to enforce the Storm Water Permit and the Clean Water Act.

3.     The Notice Letter was also sent to the registered agents for Defendants, the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Central Valley Region ("Regional Board"), as required by 40 C.F.R. § 135.2(a)(1). The Notice Letter is attached hereto as Exhibit 1 and is incorporated herein by reference.

4.     More than sixty (60) days have passed since the Notice Letter was served on Defendants and the State and Federal agencies. CSPA is informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

5.     This complaint seeks relief for Defendants' substantive and procedural violations of the

Storm Water Permit and the Clean Water Act resulting from Defendants' operations at 5339 and 5311 Jackson Street, North Highlands, California 95660 ("Facility").

6.     Venue is proper in the Eastern District of California sitting in Sacramento, California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), and Civil Local Rule 120(d) because the sources of the violations are located within this judicial district in Sacramento County.

## II.     LEGAL BACKGROUND

### A.     The Clean Water Act.

7.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

8.     The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

9.      "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7).

10.     The EPA promulgated regulations defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce.

11.     Section 505(a)(1) of the Clean Water Act provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

12.     Security Contractor Services, Inc. is a "person" within the meaning of Section 502(5) of the Clean Water Act. *See* 33 U.S.C. § 1362(5).

13.     H&H Properties is a "person" within the meaning of Section 502(5) of the Clean Water

Act. *See* 33 U.S.C. § 1362(5).

14.     An action for injunctive relief is authorized under Section 505(a) of the Clean Water Act. *See* 33 U.S.C. § 1365(a).

15.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day. *See* 33 U.S.C. §§ 1319(d) and 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

16.     Section 505(d) of the Clean Water Act allows prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees. *See* 33 U.S.C. § 1365(d).

**B.     California's Storm Water Permit.**

17.     Section 402(p) of the Clean Water Act provides that storm water discharges associated with industrial activity are subject to the Clean Water Act NPDES permit requirement. 33 U.S.C. § 1342(p)(2)(B).

18.     Section 402(b) of the Clean Water Act allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. *See* 33 U.S.C. § 1342(b). States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *See id.*

19.     California is a state authorized by EPA to issue NPDES permits.

20.     In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

21.     The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to the Clean Water Act. *See* Storm Water Permit, Finding No. 15.

22.     In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit. Storm Water Permit, Finding No. 2. Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of

Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* Storm Water Permit, Finding No. 3.

23.    Violations of the Storm Water Permit are violations of the Clean Water Act. *See* Storm Water Permit, Section C(1) (Standard Provisions).

**C.    The Storm Water Permit's Effluent Limitations and Receiving Water Limitations.**

24.    Effluent Limitation (B)(3) of the Storm Water Permit requires dischargers covered by the Storm Water Permit to reduce or prevent pollutants in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, and fecal coliform.

25.    EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("2008 MSGP Permit") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks").

26.    The Benchmark Levels provide an objective standard to determine whether a facility's Best Management Practices ("BMPs") are successfully developed and/or implemented. *See* 2008 MSGP Fact Sheet, at 95, available at: http://www.epa.gov/npdes/pubs/msgp2008_finalfs.pdf.

27.    Discharges from an industrial facility containing pollutant concentrations that exceed Benchmark Levels indicate that the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and/or BCT for conventional pollutants. *Id*.

28.    Receiving Water Limitation C(1) of the Storm Water Permit prohibits storm water discharges from adversely impacting human health or the environment.

29.    Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of Receiving Water Limitation C(1) of the Storm Water Permit.

30.    Receiving Water Limitation C(2) of the Storm Water Permit prohibits storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a

1   Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

2       31.    Water Quality Standards ("WQS") include pollutant concentration levels determined by

3   the State Board, the various regional boards, and the EPA to be protective of the beneficial uses of the

4   waters that receive polluted discharges.

5       32.    The Water Quality Control Plan for the Sacramento and San Joaquin River (Basin Plan),

6   California Regional Water Quality Control Board, Central Valley Region ("Basin Plan") identifies the

7   "Beneficial Uses" of water bodies in the region. The existing and/or potential Beneficial Uses for the

8   waters that receive the Facility's storm water discharges, at a minimum, include: Municipal and

9   Domestic Supply, Agricultural Supply, Industrial Processes Supply, Industrial Service Supply, Water

10  Contact Recreation, Non-contact Water Recreation, Warm Freshwater Habitat, Cold Freshwater Habitat,

11  Migration, Spawning, Wildlife Habitat, Navigation. *See* Basin Plan at Table II-1.

12      33.    Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin

13  Plan are designated as impaired water bodies pursuant to section 303(d) of the Clean Water Act.

14  According to the 2010 303(d) List of Impaired Water Bodies, downstream of the Facility, the

15  Sacramento-San Joaquin River Delta is impaired by, among other things, various pesticides, mercury,

16  and unknown toxicity. 2010 Integrated Report – All Assessed Waters, available at:

17  http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2010.shtml (last accessed on

18  April 8, 2015).

19      34.    Discharges of pollutants at levels above WQS contribute to the impairment of the

20  Beneficial Uses of the waters receiving the discharges.

21      35.    WQS applicable to dischargers covered by the Storm Water Permit include, but are not

22  limited to, those set out in the Basin Plan and in the Criteria for Priority Toxic Pollutants for the State of

23  California ("CTR"), 40 C.F.R. § 131.38.

24      36.    The CTR includes numeric criteria set to protect human health and the environment in the

25  State of California. Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic

26  Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at:

27  http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

28      37.    Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards,

and/or other applicable WQS are violations of Receiving Water Limitation C(2) of the Storm Water Permit.

**D.    The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements.**

38.    Section A(1) and Provision E(2) of the Storm Water Permit require dischargers to develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") that complies with the requirements of the Storm Water Permit prior to commencing industrial activities.

39.    The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. Storm Water Permit, Section A(2).

40.    Section A(3) of the Storm Water Permit requires a discharger to name the members of its on-site Storm Water Pollution Prevention Team and to indicate each team member's responsibilities in developing, implementing, and revising the SWPPP to ensure compliance with the Storm Water Permit.

41.    Section A(4) of the Storm Water Permit requires that the SWPPP include a site map that contains, among other things: the facility boundaries, storm water drainage areas and directions of flow for each drainage area, on-site surface water bodies, nearby water bodies, areas of soil erosion, and municipal storm drain inlets where the facility's storm water discharges may be received (Section A(4)(a)); the location of the storm water collection, conveyance and discharge system and structural control measures that affect storm water discharges (Section A(4)(b)); an outline of all impervious areas of the facility, including paved areas, buildings, covered storage areas, or other roofed structures (Section (4)(c)); locations where materials are directly exposed to precipitation and where significant spills or leaks have occurred (Section A(4)(d)); and areas of industrial activity, including areas that are actual and potential pollutant sources (Section A(4)(e)).

42.    Section A(5) of the Storm Water Permit requires that the SWPPP include a list of significant materials handled and stored at the site.

43.    Section A(6)(a) of the Storm Water Permit requires that the SWPPP include a narrative description of the facility's industrial activities, associated potential pollutant sources, and potential pollutants that could be discharged in storm water discharges.

44.     Section A(6)(b) of the Storm Water Permit requires that the SWPPP include a summary of all areas of industrial activities, potential pollutant sources, and potential pollutants.

45.     Section A(7)(a) of the Storm Water Permit requires that the SWPPP include a narrative assessment of all industrial activities and potential pollutant sources to determine which areas of the facility are likely sources of pollutants and which pollutants are likely to be present in the storm water discharges.

46.     Section A(7)(b) of the Storm Water Permit requires that the SWPPP include a summary of the areas of the facility that are likely sources of pollutants and the corresponding pollutants likely to be present in storm water discharges.

47.     Section A(8) of the Storm Water Permit requires that the SWPPP include a narrative description of the storm water BMPs to be implemented at the facility for each potential pollutant and its source. Dischargers must develop and implement structural and/or non-structural BMPs to reduce or prevent pollutants in storm water discharges. Storm Water Permit, Sections A(8)(a) and (b).

48.     Section A(9) of the Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. Sections A(9)(a)-(c) of the Storm Water Permit also require that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports, and sampling and analysis results; a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system; a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed; and a visual inspection of equipment needed to implement the SWPPP. Section A(9)(d) of the Storm Water Permit requires that the discharger submit an evaluation report that includes an identification of personnel performing the evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance with the Storm Water Permit. Storm Water Permit, Section A(9)(d)(i)-(vi). If certification of compliance cannot be provided, the discharger must explain in the evaluation report why the facility is not in compliance with the Storm Water Permit. *Id*., Section A(9)(d). The evaluation report shall be

submitted as part of the Annual Report required by Section B(14) of the Storm Water Permit. *Id.*

49. Section A(10) of the Storm Water Permit requires that the discharger revise the SWPPP as necessary prior to changes in industrial activities, or as otherwise required by the Storm Water Permit.

**E. The Storm Water Permit's Monitoring and Reporting Requirements.**

50. Provision E(3) and Section B(1) of the Storm Water Permit require dischargers to develop and implement a Monitoring and Reporting Program ("M&RP") prior to commencing industrial activities.

51. The objectives of the M&RP are to ensure that BMPs have been adequately developed and implemented, revised when necessary, and that storm water discharges are in compliance with the Storm Water Permit's Effluent Limitations and Receiving Water Limitations. Storm Water Permit, Sections B(2)(a) and B(2)(b).

52. The M&RP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. Storm Water Permit, Section B(2)(c) and B(2)(d).

53. Section B(2)(d) requires that the M&RP "shall be revised" as necessary to ensure compliance with the Storm Water Permit.

54. Section B(4)(a) of the Storm Water Permit requires dischargers to conduct monthly visual observations of storm water discharges during the first hour of discharge and at all discharge locations during the Wet Season (defined as October 1 – May 30).

55. Section B(4)(c) of the Storm Water Permit requires dischargers to document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. This same section requires dischargers to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. Section B(4)(c) of the Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility.

56. Sections B(5) and B(7) of the Storm Water Permit require dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged.

57.     Section B(5)(a) of the Storm Water Permit requires dischargers to collect storm water samples during the first hour of discharge from the first storm event of the Wet Season and at least one other storm event in the Wet Season. All storm water discharge locations must be sampled. *See* Storm Water Permit, Section B(5)(a). Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events of the Wet Season and must explain in the Annual Report why the first storm event was not sampled. *See id*.

58.     Section B(5)(b) requires that sampling conducted pursuant to the Storm Water Permit occurs during scheduled facility operating hours that are preceded by at least three (3) working days without storm water discharge.

59.     Section B(5)(c)(i) of the Storm Water Permit requires dischargers to analyze each sample for pH, specific conductance ("SC"), TSS, and total organic carbon ("TOC"). A discharger may substitute analysis for O&G instead of TOC.

60.     Section B(5)(c)(ii) of the Storm Water Permit requires dischargers to analyze each sample for toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharged from the facility.

61.     Section B(5)(c)(iii) and Table D of the Storm Water Permit requires facilities classified as SIC Code 3496, such as the Facility, to analyze storm water samples for aluminum, iron, nitrate + nitrite ("N+N"), and zinc.

62.     Section B(14) of the Storm Water Permit requires that dischargers submit an Annual Report to the applicable regional board by July 1 of each year. The Annual Report must include a summary of visual observations and sampling results, an evaluation of the visual observations and sampling and analysis results, laboratory reports, the annual comprehensive site compliance evaluation report specified in Section A(9), an explanation of why a facility did not implement any activities required, and the records specified in Section B(13)(i).

III.    **PARTIES**

    A.    **California Sportfishing Protection Alliance.**

63.     CSPA is a 501(c)(3) non-profit public benefit conservation and research organization. CSPA was established in 1983 for the purpose of conserving, restoring, and enhancing the state's water

quality, wildlife, fishery resources, aquatic ecosystems, and associated riparian habitats. CSPA accomplishes its mission by actively seeking federal, state, and local agency implementation of environmental regulations and statutes and routinely participates in administrative, legislative, and judicial proceedings.

64.     When necessary, CSPA directly initiates enforcement actions on behalf of itself and its members to protect public trust resources.

65.     CSPA's office is located at 3536 Rainier Avenue, Stockton, California 95204.

66.     Members of CSPA live, work, and/or recreate near the Sacramento-San Joaquin River Delta and its tributaries. For example, CSPA members use and enjoy these waters for fishing, boating, swimming, bird watching, picnicking, viewing wildlife, and engaging in scientific study.

67.     The unlawful discharge of pollutants from the Facility impairs each of these uses. Further, the Facility's discharges of polluted storm water are ongoing and continuous. As a result, CSPA's members' use and enjoyment of the Sacramento-San Joaquin River Delta and its tributaries has been and continues to be adversely impacted.

68.     Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by the failure of the Facility owner and/or operator to comply with the Storm Water Permit and the Clean Water Act.

**B.     The Facility Owners and/or Operators.**

69.     Security Contractor Services, Inc. is an active corporation registered to operate in California since at least 1961.

70.     H&H Properties is an active limited liability company registered to operate in California since at least 2008.

71.     CSPA is informed and believes, and thereon alleges, that Security Contractor Services, Inc. has been an owner and/or operator of the Facility since at least 2004.

72.     CSPA is informed and believes, and thereon alleges, that H&H Properties has been an owner and/or operator of the Facility since at least 2004.

73.     The Registered Agent for Security Contractor Services, Inc. is Corporation Service Company Which Will Do Business In California As CSC - Lawyers Incorporating Service located at

1    2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 95833.

2        74.    The Registered Agent for H&H Properties is George Honore located at 1350 E. St. James

3    Street, San Jose, California 95116.

4        75.    Security Contractor Services, Inc. and H&H Properties will herein be referred to as the

5    Facility Owners and/or Operators.

6    **IV.      FACTUAL BACKGROUND**

7        **A.    Facility Site Description.**

8        76.    CSPA is informed and believes, and thereon alleges, that Facility is approximately 6.4

9    acres bordered by Magpie Creek along the western and northern boundary, Jackson Street on the east

10   and another commercial/industrial property adjacent to the south of the Facility.

11       77.    The Facility Owners and/or Operators identify two main structures at the Facility.

12       78.    A metal manufacturing building is located on the northern portion of the Facility, which

13   includes administrative offices and a fabrication shop.

14       79.    An additional metal manufacturing building is located on the southern portion of the

15   Facility, which includes additional administrative offices and warehouse and maintenance space.

16       80.    A structurally covered saw-cutting operation where galvanized pipe is cut to length is

17   located in the middle of the Facility.

18       81.    The Facility is composed mostly of impervious surfaces, including buildings and asphalt

19   and concrete paved surfaces except for an unpaved surface between the south warehouse and the

20   southern property line, several areas of graveled or crushed stone pavement throughout the Facility, and

21   landscaped areas along the Facility frontage on Jackson Street.

22       82.     CSPA is informed and believes, and thereon alleges, that there are two (2) driveways

23   allowing entrance and egress from the portion of the Facility located at 5339 Jackson Street.

24       83.    CSPA is informed and believes, and thereon alleges, that there are two (2) driveways

25   allowing entrance and egress from the portion of the Facility located at 5311 Jackson Street.

26       **B.    The Facility's Storm Water Permit Coverage.**

27       84.    Information available to CSPA indicates that the Facility Owners and/or Operators

28   submitted an NOI for the Facility in January 2004 ("NOI").

85.     The NOI lists the Facility operator as H&H Properties at PO Box 547, San Jose, California 95106.

86.     The NOI lists the Facility name as Security Contractor Services located at 5339 Jackson Street, North Highlands, California 95660 consisting of approximately 6.42 acres, 90% of which is impervious.

87.     Upon receipt of the NOI, the State Board assigned the Facility Waste Discharge Identification number 5S34I018621.

88.     The NOI lists a Standard Industrial Classification ("SIC") code for the Facility as 3446 (metal work manufacturing).

89.     The NOI lists a SIC code for the Facility as 3496 (fabricated wire manufacturing).

90.     The Storm Water Permit regulates SIC code 3446 and 3496 facilities where industrial materials, equipment, or activities are exposed to storm water. *See* Storm Water Permit, Attachment 1, ¶ 10.

91.     CSPA is informed and believes, and thereon alleges, that industrial materials, equipment, and activities are exposed to storm water throughout the Facility, including manufacture, storage, and distribution of galvanized fencing and fencing supplies.

92.     CSPA is informed and believes, and thereon alleges, that the areas at the Facility where industrial materials, equipment, and/or activities are exposed to storm water require Storm Water Permit coverage.

**C.     Defendants' SWPPP and M&RP for the Facility.**

93.     In a January 20, 2015, letter to the Facility Owners and/or Operators, the Regional Board requested a copy of the current Facility SWPPP and M&RP.

94.     On or about February 23, 2015, the Regional Board provided CSPA with a copy of the SWPPP and M&RP that it received from the Facility Owners and/or Operators in response to its January 20, 2015, letter.

95.     The SWPPP provided to CSPA by the Regional Board on or about February 23, 2015, is dated February 20, 2015.

96.     CSPA is informed and believes, and thereon alleges, that the SWPPP dated February 20 is

Complaint                                              13

1  the current SWPPP and M&RP for the Facility ("Facility SWPPP").

2  **D.   Industrial Activities, Pollutant Sources, Pollutants, and BMPs at the Facility.**

3  **i.   <u>Industrial Activities and Pollutant Sources</u>**

4  97.   CSPA is informed and believes, and thereon alleges, that the following industrial

5  operations are conducted at the Facility: metals manufacturing, fabricated wire manufacturing, materials

6  and waste storage, operational activities, equipment and parts storage, and facility maintenance.

7  98.   In Section 1.3 of the Facility SWPPP the Facility Owners and/or Operators state that the

8  Facility is primarily engaged in the manufacture, storage, and distribution of galvanized fencing and

9  fencing supplies, and that the galvanized (zinc-treated) wire is delivered to the site in large rolls that are

10 lubricated with wire lube and weaved into a chain link fence.

11 99.   In Section 1.3 of the Facility SWPPP the Facility Owners and/or Operators state that the

12 Facility custom-cuts galvanized piping for use as fencing posts, some of which is coated with polyvinyl

13 chloride (PVC).

14 100.   In Section 1.3 of the Facility SWPPP the Facility Owners and/or Operators state that

15 equipment including forklifts and trucks are regularly maintained on-site by an outside contractor, which

16 includes replacement of coolants, lubricants, greasing, battery charging, and equipment cleaning.

17 101.   CSPA is informed and believes, and thereon alleges, that the Facility's industrial activities

18 and areas of industrial activity are pollutant sources.

19 102.   Section 2.1 of the Facility SWPPP describes the facility operations, which include

20 building #1 used for administrative offices and manufacturing, outdoor galvanized wire storage, metal

21 manufacturing building used for ornamental iron fencing panel and miscellaneous item storage, outdoor

22 equipment storage, roofed pipe resizing area, storage shed used to store ornamental iron fencing panels,

23 wooden tool and miscellaneous non-liquid storage building, shipping and receiving areas, material

24 handling and storage areas, which include outdoor galvanized woven wire fencing panels and equipment

25 storage, waste management and dust generating activities, sanitary sewer system, and building roofing

26 system.

27 103.   Section 4.1 and Table 2 of the Facility SWPPP describe significant materials handled or

28 stored at the Facility.

104.    Section 4.3 of the Facility SWPPP describes the industrial processes conducted at the Facility.

105.    Section 4.4 of the Facility SWPPP describes the potential areas of storm water contamination at the Facility.

106.    Section 4.5 of the Facility SWPPP describes areas of potential soil erosion.

107.    Section 4.6 of the Facility SWPPP describes non-storm water discharges at the Facility.

108.    CSPA is informed and believes, and thereon alleges, that the Facility SWPPP fails to adequately describe all of the significant materials and processes that are related to the Facility's industrial activities.

109.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed, and continue to fail to, adequately describe all of the significant materials and processes that are related to the Facility's industrial activities.

110.    CSPA is informed and believes, and thereon alleges, that the Facility SWPPP fails to adequately describe all of the Facility's industrial activities.

111.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed, and continue to fail to, adequately describe all of the Facility's industrial activities.

112.    CSPA is informed and believes, and thereon alleges, that the Facility SWPPP fails to adequately describe all of the Facility's potential pollutant sources.

113.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed, and continue to fail to, adequately describe all of the Facility's potential pollutant sources.

114.    CSPA is informed and believes, and thereon alleges, that the Facility SWPPP fails to adequately assess all of the Facility's potential pollutant sources.

115.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed, and continue to fail to, adequately assess potential pollutant sources at the Facility.

116.    CSPA is informed and believes, and thereon alleges, that Figure 1 and Figure 2 of the

1    Facility SWPPP constitute the Facility site map.

2        117.    CSPA is informed and believes, and thereon alleges, that the description of the Facility

3    included in Section 1.3 is not fully depicted on the Facility site map.

4        118.    CSPA is informed and believes, and thereon alleges, that the Facility site map is

5    inadequate, as it does not identify the location of all industrial activities at the Facility.

6        119.    CSPA is informed and believes, and thereon alleges, that the Facility site map is

7    inadequate, as it does not identify structural control measures that affect storm water discharges.

8        120.    CSPA is informed and believes, and thereon alleges, that the Facility site map is

9    inadequate, as it does not identify locations where materials are directly exposed to precipitation.

10       **ii.  Pollutants**

11       121.    CSPA is informed and believes, and thereon alleges, that pollutants associated with the

12   Facility include, but are not limited to: TSS, O&G, pH-affecting substances, oxygen-depleting

13   chemicals, aluminum, iron, zinc, and N+N.

14       122.    Table 4 of the Facility SWPPP provides a summary of potential pollutant sources,

15   pollutants, and BMPs at the Facility.

16       123.    Table 2 of the Facility SWPPP lists types of pollutants corresponding with areas of

17   industrial activities and pollutant sources as including "particulate," "metal cuttings," "dust," "oil and

18   grease," "particulate," "zinc," "metal dust and cuttings," "Oils and Greases," "organics," "O&G," "Dust

19   and Pollutants from Adjacent Sites & Business."

20       124.    CSPA is informed and believes, and thereon alleges, that Table 4 fails to adequately

21   describe the type of pollutants associated with likely pollutant sources at the Facility, as Table 4 lists

22   only generalized categories of pollutants such as "metal cuttings" and "organics" rather than specific

23   pollutants such as aluminum, iron, N+N, or TSS.

24       125.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or

25   Operators have failed, and continues to fail to, identify all pollutants that are associated with industrial

26   activities or areas at the Facility.

27       **iii.  BMPs**

28       126.    CSPA is informed and believes, and thereon alleges, that industrial activities occur

throughout the Facility outdoors without adequate cover to prevent storm water exposure to pollutant sources.

127. CSPA is informed and believes, and thereon alleges, that industrial activities occur throughout the Facility outdoors without secondary containment or other adequate treatment measures to prevent polluted storm water from discharging from the Facility.

128. Table 4 of the Facility SWPPP identifies the BMPs for the areas of industrial activity at the Facility.

129. Section 5.0 of the Facility SWPPP describes non-structural and structural BMPs at the Facility.

130. CSPA is informed and believes, and thereon alleges, that neither Table 4, Section 5.0, nor any other section of the Facility SWPPP describes adequate BMPs to reduce or prevent pollutants in the Facility's discharges.

131. CSPA is informed and believes, and thereon alleges, that without properly identifying all industrial activities at the Facility in the SWPPP, the Facility Owners and/or Operators cannot and have not developed all appropriate BMPs.

132. CSPA is informed and believes, and thereon alleges, that without properly identifying all industrial activities at the Facility in the SWPPP, the Facility Owners and/or Operators cannot and have not implemented all appropriate BMPs.

133. CSPA is informed and believes, and thereon alleges, that without properly identifying all significant materials at the Facility in the SWPPP, the Facility Owners and/or Operators cannot and have not developed all appropriate BMPs.

134. CSPA is informed and believes, and thereon alleges, that without properly identifying all significant materials at the Facility in the SWPPP, the Facility Owners and/or Operators cannot and have not implemented all appropriate BMPs.

135. CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed and continue to fail to adequately assess the Facility's BMPs corresponding to potential pollutant sources and associated pollutants.

136. CSPA is informed and believes, and thereon alleges, that the Facility SWPPP does not

Complaint                                                    17

include an adequate assessment of the Facility's BMPs corresponding to potential pollutant sources and associated pollutants.

137.    CSPA is informed and believes, and thereon alleges, that the Facility SWPPP does not include an adequate description of the Facility BMPs.

138.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed and continue to fail to adequately describe the Facility BMPs.

139.    CSPA is informed and believes, and thereon alleges, that the Facility SWPPP does not include an adequate analysis of the effectiveness of the BMPs at the Facility.

140.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed and continue to fail to adequately analyze the effectiveness of the BMPs at the Facility.

141.    CSPA is informed and believes, and thereon alleges, that the Facility SWPPP does not include an adequate summary of the Facility BMPs by pollutant source.

142.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed and continue to fail to adequately summarize the Facility BMPs by pollutant source.

143.    CSPA is informed and believes, and thereon alleges, that the Facility Owners' and/or Operators' failure to develop and/or implement BMPs required by the Storm Water Permit to reduce or eliminate pollutant levels in discharges is documented by the Regional Board.

144.    In 2006, 2007, and 2008, the Regional Board issued "Failure to Comply with the General Permit for Storm Water Discharges Associated with Industrial Activities" notices to the Facility Owners and/or Operators informing them that they failed to file the required Annual Reports.

145.    CSPA is informed and believes, and thereon alleges, that Annual Reports are meant to allow permittees, such as the Facility Owners and/or Operators, to evaluate a facility's BMPs.

146.    On May 1, 2008, the Regional Board notified the Facility Owners and/or Operators that the levels of pollutants in the Facility storm water indicate that current BMPs are not sufficient to comply with the Storm Water Permit requirements, and required the Facility Owners and/or Operators to modify the Facility BMPs and submit a responsive report.

147.    On October 23, 2009, the Regional Board notified the Facility Owners and/or Operators that the levels of pollutants in the Facility storm water indicate that current BMPs are not sufficient to comply with the Storm Water Permit requirements, and required the Facility Owners and/or Operators to modify the Facility BMPs and submit a responsive report.

148.    On November 30, 2009, the Facility Owners and/or Operators submitted a report in response to the Regional Board's October 23 letter that proposed BMP improvements.

149.    CSPA is informed and believes, and thereon alleges, that storm water sampling, including sampling collected after November 20, 2009, from the Facility demonstrates that the Facility's storm water discharges contain concentrations of pollutants above the Benchmark Levels, including, but not limited to, TSS, O&G, aluminum, iron, zinc, and N+N.

150.    CSPA is informed and believes, and thereon alleges, that the repeated and significant exceedances of Benchmark Levels demonstrate that the Facility Owners and/or Operators failed and continue to fail to develop BMPs to prevent the exposure of pollutants to storm water, and to prevent discharges of polluted storm water from the Facility.

151.    CSPA is informed and believes, and thereon alleges, that the repeated and significant exceedances of Benchmark Levels demonstrate that the Facility Owners and/or Operators failed and continue to fail to implement BMPs to prevent the exposure of pollutants to storm water, and to prevent discharges of polluted storm water from the Facility.

152.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed and continue to fail to adequately develop a SWPPP that complies with the Storm Water Permit.

153.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed and continues to fail to adequately implement a SWPPP that complies with the Storm Water Permit.

154.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed and continue to fail to adequately revise the SWPPP, despite repeated and significant concentrations of pollutants in the Facility's storm water discharges.

///

1    **E.      Discharge Locations at the Facility.**

2        155.    CSPA is informed and believes, and thereon alleges, that there are at least seven (7)

3    discharge locations at the Facility.

4        156.    Section 1.4 of the Facility SWPPP describes the Facility storm drain system, which

5    includes three (3) discharge points.

6        157.    The Facility Owners and/or Operators identify the discharge location from which storm

7    water discharges from the northern area of the Facility, including portions of the Rental Yard, as "SP-1."

8        158.    The Facility Owners and/or Operators describe two (2) storm drain pipes that discharge

9    storm water to a discharge location the Facility Owners and/or Operators identify as "DP-2."

10       159.    The Facility Owners and/or Operators identify the storm drain pipe that discharges storm

11   water to DP-2 from the portion of the Facility that extends from the municipal storm sewer north to the

12   shop and office building as "DP-2A."

13       160.    The Facility Owners and/or Operators identify the storm drain pipe that discharges storm

14   water to DP-2 from the portion of the Facility south of the municipal storm sewer system including the

15   warehouse and the area west of the warehouse as "DP-2B."

16       161.    The Facility Owners and/or Operators identify the discharge location from which storm

17   water discharges from the area in front of the warehouse where fittings and saleable material is stored as

18   "DP-1."

19       162.    In the Facility's Annual Reports the Facility Owners and/or Operators reports that there

20   are two (2) discharge locations at the Facility.

21       163.    The Facility SWPPP states a municipal storm sewer runs from east to west through the

22   middle of the Facility, which drains the portion of Jackson Street that lies south of the Facility.

23       164.    The Facility SWPPP states a municipal storm sewer also runs from south to north along

24   Jackson Street.

25       165.    The Facility SWPPP states that DP-1 and DP-2 are part of the municipal storm sewer.

26       166.    The Facility SWPPP states that onsite drainage is provided by several catch basins or

27   drop inlets that either discharge directly to Magpie Creek or that discharge to the municipal storm sewer

28   that runs through the Facility and discharges to Magpie Creek.

167.    CSPA is informed and believes, and thereon alleges, that the pollutants associated with the Facility have been and continue to be tracked throughout the Facility.

168.    CSPA is informed and believes, and thereon alleges, that trucks and vehicles track sediment, dirt, oil and grease, metal particles, and other pollutants off-site via the four (4) driveways from Facility.

169.    CSPA is informed and believes, and thereon alleges, that the four (4) driveways at the Facility are discharge locations.

170.    CSPA is informed and believes, and thereon alleges, that the Facility SWPPP site map does not include an outline of all storm water drainage areas within the Facility boundaries.

171.    CSPA is informed and believes, and thereon alleges, that the Facility SWPPP site map does not adequately identify all discharge points.

172.    CSPA is informed and believes, and thereon alleges, that the Facility SWPPP site map does not include municipal storm sewer drain inlets that receive the Facility's storm water discharges.

173.    CSPA is informed and believes, and thereon alleges, that the Facility SWPPP site map does not include areas impacted by run-on from surrounding areas.

**F.    The Facility's Discharges to the Receiving Waters.**

174.    CSPA is informed and believes, and thereon alleges, that pollutants from the Facility discharge from each of the Facility's discharge locations to Magpie Creek, a tributary to the Sacramento-San Joaquin River Delta (collectively the "Receiving Waters") either directly or via the municipal storm sewer on the Facility.

175.    CSPA is informed and believes, and thereon alleges, that each of the Receiving Waters is a water of the United States.

176.    CSPA is informed and believes, and thereon alleges, that polluted storm water discharges from the Facility to the Receiving Waters.

**G.    Defendants' Sampling, Monitoring, and Reporting.**

177.    Via a Public Records Act request to the Regional Board, CSPA obtained an Annual Report for the Facility dated June 26, 2010.

178.    CSPA is informed and believes, and thereon alleges, that the Annual Report dated June

26, 2010, obtained from the Regional Board is the 2009-2010 Annual Report for the Facility.

179.    Via a Public Records Act request to the Regional Board, CSPA obtained an Annual Report for the Facility dated June 29, 2011.

180.    CSPA is informed and believes, and thereon alleges, that the Annual Report dated June 29, 2011, obtained from the Regional Board is the 2010-2011 Annual Report for the Facility.

181.    Via a Public Records Act request to the Regional Board, CSPA obtained an Annual Report for the Facility dated June 29, 2012.

182.    CSPA is informed and believes, and thereon alleges, that the Annual Report dated June 29, 2012, obtained from the Regional Board is the 2011-2012 Annual Report for the Facility.

183.    Via a Public Records Act request to the Regional Board, CSPA obtained an Annual Report for the Facility dated June 29, 2013.

184.    CSPA is informed and believes, and thereon alleges, that the Annual Report dated June 29, 2013, obtained from the Regional Board is the 2012-2013 Annual Report for the Facility.

185.    Via a Public Records Act request to the Regional Board, CSPA obtained an Annual Report for the Facility dated June 26, 2014.

186.    CSPA is informed and believes, and thereon alleges, that the Annual Report dated June 26, 2014, obtained from the Regional Board is the 2013-2014 Annual Report for the Facility.

187.    CSPA refers to the above-described 2009-2010 Annual Report, 2010-2011 Annual Report, 2011-2012 Annual Report, 2012-2013 Annual Report, and 2013-2014 Annual Report collectively as Defendants' "Annual Reports."

188.    CSPA is informed and believes, and thereon alleges, that Section 6 Storm Water Monitoring & Reporting Plan of the Facility SWPPP constitutes the M&RP for the Facility.

i.    **2009-2010 Annual Report**

189.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to report in the 2009-2010 Annual Report that visual observations for unauthorized non-storm water discharges were conducted for all drainage areas at the Facility.

190.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to conduct visual observations for unauthorized non-storm water discharges for all

drainage areas at the Facility in the 2009-2010 reporting year.

191. CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to include required explanations of failures to conduct required visual observations of unauthorized non-storm water discharges in the 2009-2010 Annual Report.

192. CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators report in the 2009-2010 Annual Report that it failed to conduct visual observations of all drainage areas for authorized non-storm water discharges for every quarter of the 2009-2010 reporting year.

193. CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to conduct visual observations of all drainage areas for authorized non-storm water discharges for every quarter of the 2009-2010 reporting year.

194. CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to report in the 2009-2010 Annual Report that visual observations for authorized non-storm water discharges were conducted for all drainage areas at the Facility.

195. CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to conduct visual observations for authorized non-storm water discharges for all drainage areas at the Facility in the 2009-2010 reporting year.

196. CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to include required explanations of failures to conduct required visual observations of authorized non-storm water discharges in the 2009-2010 Annual Report.

197. CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators report in the 2009-2010 Annual Report that it failed to conduct one observation of all discharge locations each month during the 2009-2010 Wet Season.

198. CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to conduct one observation of all discharge locations each month during the 2009-2010 Wet Season.

199. CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to document the presence of any floating and suspended material, oil and grease,

1   discolorations, turbidity, odor, and source of pollutants for all discharge locations during the 2009-2010

2   Wet Season.

3     200. CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or

4   Operators failed to include required records of responses taken to eliminate and reduce pollutant contact

5   with storm water in the 2009-2010 Annual Report.

6     201. CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or

7   Operators failed to collect storm water samples from all discharge locations during the 2009-2010 Wet

8   Season.

9     202. CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or

10   Operators failed to analyze storm water samples as required by the Storm Water Permit during the 2009-

11   2010 Wet Season by failing to follow proper storm water analysis and/or reporting procedures, as

12   required by Storm Water Permit, Section B.10.b. and 40 C.F.R. § 136.3.

13     203. CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or

14   Operators failed to analyze storm water samples as required by the Storm Water Permit during the 2009-

15   2010 Wet Season by failing to analyze storm water samples collected from discharge locations at the

16   Facility for all required parameters.

17     204. CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or

18   Operators failed to conduct an adequate Annual Comprehensive Site Compliance Evaluation in the

19   2009-2010 reporting year.

20     205. CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or

21   Operators failed to include required reports of incidents of non-compliance and corrective actions taken

22   in the 2009-2010 Annual Report.

23     206. CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or

24   Operators failed to include required explanations of why the Facility Owners and/or Operators did not

25   implement activities required by the Storm Water Permit the 2009-2010 Annual Report.

26     207. CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or

27   Operators erroneously certified compliance with the Storm Water Permit in the 2009-2010 Annual

28   Report.

## ii. 2010-2011 Annual Report

208.   CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to report in the 2010-2011 Annual Report that visual observations for unauthorized non-storm water discharges were conducted for all drainage areas at the Facility.

209.   CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to conduct visual observations for unauthorized non-storm water discharges for all drainage areas at the Facility in the 2010-2011 reporting year.

210.   CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to include required explanations of failures to conduct required visual observations of unauthorized non-storm water discharges in the 2010-2011 Annual Report.

211.   CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators report in the 2010-2011 Annual Report that it failed to conduct visual observations of all drainage areas for authorized non-storm water discharges for every quarter of the 2010-2011 reporting year.

212.   CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to conduct visual observations of all drainage areas for authorized non-storm water discharges for every quarter of the 2010-2011 reporting year.

213.   CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to report in the 2010-2011 Annual Report that visual observations for authorized non-storm water discharges were conducted for all drainage areas at the Facility.

214.   CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to conduct visual observations for authorized non-storm water discharges for all drainage areas at the Facility in the 2010-2011 reporting year.

215.   CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to include required explanations of failures to conduct required visual observations of authorized non-storm water discharges in the 2010-2011 Annual Report.

216.   CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators report in the 2010-2011 Annual Report that it failed to conduct one observation of all

discharge locations each month during the 2010-2011 Wet Season.

217.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to conduct one observation of all discharge locations each month during the 2010-2011 Wet Season.

218.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to document the presence of any floating and suspended material, oil and grease, discolorations, turbidity, odor, and source of pollutants for all discharge locations during the 2010-2011 Wet Season.

219.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to include required records of responses taken to eliminate and reduce pollutant contact with storm water in the 2010-2011 Annual Report.

220.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to collect storm water samples from all discharge locations during the 2010-2011 Wet Season.

221.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to analyze storm water samples as required by the Storm Water Permit during the 2010-2011 Wet Season by failing to follow proper storm water analysis and/or reporting procedures, as required by Storm Water Permit, Section B.10.b. and 40 C.F.R. § 136.3.

222.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to analyze storm water samples as required by the Storm Water Permit during the 2010-2011 Wet Season by failing to analyze storm water samples collected from discharge locations at the Facility for all required parameters.

223.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to conduct an adequate Annual Comprehensive Site Compliance Evaluation in the 2010-2011 reporting year.

224.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to include required reports of incidents of non-compliance and corrective actions taken in the 2010-2011 Annual Report.

Complaint                                    26

225.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to include required explanations of why the Facility Owners and/or Operators did not implement activities required by the Storm Water Permit the 2010-2011 Annual Report.

226.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators erroneously certified compliance with the Storm Water Permit in the 2010-2011 Annual Report.

### iii. 2011-2012 Annual Report

227.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators report in the 2011-2012 Annual Report that visual observations for unauthorized non-storm water discharges were not conducted for all drainage areas at the Facility.

228.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to conduct visual observations for unauthorized non-storm water discharges for all drainage areas at the Facility in the 2011-2012 reporting year.

229.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to report in the 2011-2012 Annual Report that visual observations for unauthorized non-storm water discharges were conducted for all drainage areas at the Facility.

230.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators report in the 2011-2012 Annual Report that visual observations for authorized non-storm water discharges were not conducted for all drainage areas at the Facility.

231.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to conduct visual observations for authorized non-storm water discharges for all drainage areas at the Facility in the 2011-2012 reporting year.

232.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to conduct visual observations for unauthorized non-storm water discharges for all drainage areas at the Facility in the 2011-2012 reporting year.

233.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators report in the 2011-2012 Annual Report that it failed to conduct visual observations of all drainage areas for authorized non-storm water discharges for every quarter of the 2011-2012 reporting

year.

234.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to conduct visual observations of all drainage areas for authorized non-storm water discharges for every quarter of the 2011-2012 reporting year.

235.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to report in the 2011-2012 Annual Report that visual observations for authorized non-storm water discharges were conducted for all drainage areas at the Facility.

236.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to conduct visual observations for authorized non-storm water discharges for all drainage areas at the Facility in the 2011-2012 reporting year.

237.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to include required explanations of failures to conduct required visual observations of authorized non-storm water discharges in the 2011-2012 Annual Report.

238.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators report in the 2011-2012 Annual Report that it failed to conduct one observation of all discharge locations each month during the 2011-2012 Wet Season.

239.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to conduct one observation of all discharge locations each month during the 2011-2012 Wet Season.

240.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to document the presence of any floating and suspended material, oil and grease, discolorations, turbidity, odor, and source of pollutants for all discharge locations during the 2011-2012 Wet Season.

241.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to include required records of responses taken to eliminate and reduce pollutant contact with storm water in the 2011-2012 Annual Report.

242.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators report in the 2011-2012 Annual Report that Facility field staff lacked proper training to

1   conduct required visual observations of storm water discharges in the 2011-2012 Wet Season.

2   243.   CSPA is informed and believes, and thereon alleges, that Facility field staff lacked proper

3   training to conduct required visual observations of storm water discharges in the 2011-2012 Wet Season.

4   244.   CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or

5   Operators report in the 2011-2012 Annual Report that storm water samples were not collected at all

6   discharge locations at the Facility during the 2011-2012 Wet Season.

7   245.   CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or

8   Operators failed to collect storm water samples from all discharge locations during the 2011-2012 Wet

9   Season.

10   246.   CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or

11   Operators failed to analyze storm water samples as required by the Storm Water Permit during the 2011-

12   2012 Wet Season by failing to follow proper storm water analysis and/or reporting procedures, as

13   required by Storm Water Permit, Section B.10.b. and 40 C.F.R. § 136.3.

14   247.   CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or

15   Operators failed to analyze storm water samples as required by the Storm Water Permit during the 2011-

16   2012 Wet Season by failing to analyze storm water samples collected from discharge locations at the

17   Facility for all required parameters.

18   248.   CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or

19   Operators failed to conduct an adequate Annual Comprehensive Site Compliance Evaluation in the

20   2011-2012 reporting year.

21   249.   CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or

22   Operators failed to include required reports of incidents of non-compliance and corrective actions taken

23   in the 2011-2012 Annual Report.

24   250.   CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or

25   Operators failed to include required explanations of why the Facility Owners and/or Operators did not

26   implement activities required by the Storm Water Permit the 2011-2012 Annual Report.

27   251.   CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or

28   Operators did not certify compliance with the Storm Water Permit in the 2011-2012 Annual Report.

Complaint                                    29

252.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators report that the Facility was not in compliance with the Storm Water Permit in the 2011-2012 Annual Report.

253.    CSPA is informed and believes, and thereon alleges, that the Facility was not in compliance with the Storm Water Permit in the 2011-2012 reporting year.

### iv.  2012-2013 Annual Report

254.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to report in the 2012-2013 Annual Report that visual observations for unauthorized non-storm water discharges were conducted for all drainage areas at the Facility.

255.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to conduct visual observations for unauthorized non-storm water discharges for all drainage areas at the Facility in the 2012-2013 reporting year.

256.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to include required explanations of failures to conduct required visual observations of unauthorized non-storm water discharges in the 2012-2013 Annual Report.

257.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to report in the 2012-2013 Annual Report that visual observations for authorized non-storm water discharges were conducted for all drainage areas at the Facility.

258.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to conduct visual observations for authorized non-storm water discharges for all drainage areas at the Facility in the 2012-2013 reporting year.

259.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to include required explanations of failures to conduct required visual observations of authorized non-storm water discharges in the 2012-2013 Annual Report.

260.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators report in the 2012-2013 Annual Report that it failed to conduct one observation of all discharge locations each month during the 2012-2013 Wet Season.

261.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or

1    Operators failed to conduct one observation of all discharge locations each month during the 2012-2013

2    Wet Season.

3          262.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or

4    Operators failed to document the presence of any floating and suspended material, oil and grease,

5    discolorations, turbidity, odor, and source of pollutants for all discharge locations during the 2012-2013

6    Wet Season.

7          263.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or

8    Operators failed to include required records of responses taken to eliminate and reduce pollutant contact

9    with storm water in the 2012-2013 Annual Report.

10         264.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or

11   Operators report in the 2012-2013 Annual Report that Facility field staff lacked proper training to

12   conduct required visual observations of storm water discharges in the 2012-2013 Wet Season.

13         265.    CSPA is informed and believes, and thereon alleges, that Facility field staff lacked proper

14   training to conduct required visual observations of storm water discharges in the 2012-2013 Wet Season.

15         266.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or

16   Operators failed to collect storm water samples from all discharge locations during the 2012-2013 Wet

17   Season.

18         267.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or

19   Operators failed to analyze storm water samples as required by the Storm Water Permit during the 2012-

20   2013 Wet Season by failing to follow proper storm water analysis and/or reporting procedures, as

21   required by Storm Water Permit, Section B.10.b. and 40 C.F.R. § 136.3.

22         268.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or

23   Operators failed to analyze storm water samples as required by the Storm Water Permit during the 2012-

24   2013 Wet Season by failing to analyze storm water samples collected from discharge locations at the

25   Facility for all required parameters.

26         269.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or

27   Operators failed to conduct an adequate Annual Comprehensive Site Compliance Evaluation in the

28   2012-2013 reporting year.

Complaint                                           31

270.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to include required reports of incidents of non-compliance and corrective actions taken in the 2012-2013 Annual Report.

271.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to include required explanations of why the Facility Owners and/or Operators did not implement activities required by the Storm Water Permit the 2012-2013 Annual Report.

272.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators did not certify compliance with the Storm Water Permit in the 2012-2013 Annual Report.

273.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators report that the Facility was not in compliance with the Storm Water Permit in the 2012-2013 Annual Report.

274.    CSPA is informed and believes, and thereon alleges, that the Facility was not in compliance with the Storm Water Permit in the 2012-2013 reporting year.

**v.  2013-2014 Annual Report**

275.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to report in the 2013-2014 Annual Report that visual observations for unauthorized non-storm water discharges were conducted for all drainage areas at the Facility.

276.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to conduct visual observations for unauthorized non-storm water discharges for all drainage areas at the Facility in the 2013-2014 reporting year.

277.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to include required explanations of failures to conduct required visual observations of unauthorized non-storm water discharges in the 2013-2014 Annual Report.

278.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to report in the 2013-2014 Annual Report that visual observations for authorized non-storm water discharges were conducted for all drainage areas at the Facility.

279.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to conduct visual observations for authorized non-storm water discharges for all

drainage areas at the Facility in the 2013-2014 reporting year.

280.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to include required explanations of failures to conduct required visual observations of authorized non-storm water discharges in the 2013-2014 Annual Report.

281.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to conduct one observation of all discharge locations each month during the 2013-2014 Wet Season.

282.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to document the presence of any floating and suspended material, oil and grease, discolorations, turbidity, odor, and source of pollutants for all unobserved locations during the 2013-2014 Wet Season.

283.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators report in the 2013-2014 Annual Report that storm water samples were not collected from the first storm event of the Wet Season during the 2013-2014 Wet Season.

284.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to collect storm water samples from the first storm event of the Wet Season during the 2013-2014 Wet Season.

285.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators report in the 2013-2014 Annual Report that storm water samples were not collected during the first hour of discharge during the 2013-2014 Wet Season.

286.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to collect storm water samples during the first hour of discharge during the 2013-2014 Wet Season.

287.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to collect storm water samples from all discharge locations during the 2013-2014 Wet Season.

288.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to analyze storm water samples as required by the Storm Water Permit during the 2013-

2014 Wet Season by failing to follow proper storm water analysis and/or reporting procedures, as required by Storm Water Permit, Section B.10.b. and 40 C.F.R. § 136.3.

289.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to analyze storm water samples as required by the Storm Water Permit during the 2013-2014 Wet Season by failing to analyze storm water samples collected from discharge locations at the Facility for all required parameters.

290.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to conduct an adequate Annual Comprehensive Site Compliance Evaluation in the 2013-2014 reporting year.

291.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to include required reports of incidents of non-compliance and corrective actions taken in the 2013-2014 Annual Report.

292.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed to include required explanations of why the Facility Owners and/or Operators did not implement activities required by the Storm Water Permit the 2013-2014 Annual Report.

293.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators did not certify compliance with the Storm Water Permit in the 2013-2014 Annual Report.

294.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators report that the Facility was not in compliance with the Storm Water Permit in the 2013-2014 Annual Report.

295.    CSPA is informed and believes, and thereon alleges, that the Facility was not in compliance with the Storm Water Permit in the 2013-2014 reporting year.

## V.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Defendants' Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Effluent Limitation B(3) and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

296.    CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

297.    CSPA is informed and believes, and thereon alleges, that Defendants failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

298.    CSPA is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the Facility.

299.    The Facility Owners and/or Operators violates and will continue to violate Effluent Limitation B(3) of the Storm Water Permit each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

300.    CSPA is informed and believes, and thereon alleges, that the Facility Owners' and/or Operators' violations of Effluent Limitation B(3) of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

301.    Each and every time the Facility Owners and/or Operators discharge contaminated storm water from the Facility in violation of Effluent Limitation B(3) of the Storm Water Permit is a separate and distinct violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a).

302.    By committing the acts and omissions alleged above, the Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from April 8, 2010, to the present, pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

303.    An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm CSPA has no plain, speedy, or adequate remedy at law.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## SECOND CAUSE OF ACTION

### Discharges of Contaminated Storm Water in Violation of Storm Water Permit Receiving Water Limitation C(1) and the Clean Water Act. 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

304.    CSPA incorporates the allegations contained in the above paragraphs as though fully set

1   forth herein.

2        305.   CSPA is informed and believes, and thereon alleges, that discharges of storm water

3   containing levels of pollutants that adversely impact human health and/or the environment from the

4   Facility occur each time storm water discharges from the Facility.

5        306.   CSPA is informed and believes, and thereon alleges, that storm water containing levels of

6   pollutants that cause or contribute to exceedances of water quality standards has discharged and

7   continues to discharge from the Facility each time storm water discharges from the Facility, and that

8   these discharges adversely impact human health and/or the environment.

9        307.   The Facility Owners and/or Operators violate and will continue to violate Receiving

10   Water Limitation C(1) of the Storm Water Permit each and every time storm water containing levels of

11   pollutants that adversely impact human health and/or the environment discharges from the Facility.

12        308.   CSPA is informed and believes, and thereon alleges, that the Facility Owners' and/or

13   Operators' violations of Receiving Water Limitation C(1) of the Storm Water Permit and the CWA are

14   ongoing and continuous.

15        309.   Each and every violation of Receiving Water Limitation C(1) of the Storm Water Permit

16   is a separate and distinct violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a).

17        310.   By committing the acts and omissions alleged above, the Facility Owners and/or

18   Operators are subject to an assessment of civil penalties for each and every violation of the CWA

19   occurring from April 8, 2010, to the present, pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C.

20   §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

21        311.   An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C.

22   § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm

23   Plaintiff and the citizens of the State of California, for which harm CSPA has no plain, speedy, or

24   adequate remedy at law.

25        WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

26   ///

27   ///

28   ///

Complaint                                   36

### THIRD CAUSE OF ACTION

**Defendants' Discharges of Contaminated Storm Water in Violation of Storm Water Permit Receiving Water Limitation C(2) and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

312.   CSPA incorporates the allegations contained in the above paragraph as though fully set forth herein.

313.   CSPA is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards from the Facility occur each time storm water discharges from the Facility.

314.   The Facility Owners and/or Operators violate and will continue to violate Receiving Water Limitation C(2) of the Storm Water Permit each and every time storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards discharges from the Facility.

315.   CSPA is informed and believes, and thereon alleges, that the Facility Owners' and/or Operators' violations of Receiving Water Limitation C(2) of the Storm Water Permit and the CWA are ongoing and continuous.

316.   Each and every violation of Receiving Water Limitation C(2) of the Storm Water Permit is a separate and distinct violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a).

317.   By committing the acts and omissions alleged above, the Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from April 8, 2010, to the present, pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

318.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm CSPA has no plain, speedy, or adequate remedy at law.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

///

///

**FOURTH CAUSE OF ACTION**

**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollution Prevention Plan in Violation of Section A and Provision E(2) of the Storm Water Permit and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

319.   CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

320.   CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed and continue to fail to develop an adequate SWPPP for the Facility, in violation of Section A and Provision E(2) of the Storm Water Permit.

321.   CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed and continue to fail to adequately implement a SWPPP for the Facility, in violation of Section A and Provision E(2) of the Storm Water Permit.

322.   CSPA is informed and believes, and thereon alleges, that Facility Owners and/or Operators have failed and continue to fail to adequately revise a SWPPP for the Facility, in violation of Sections A(9) and A(10) of the Storm Water Permit.

323.   The Facility Owners and/or Operators have been in violation of Section A and Provision E(2) of the Storm Water Permit at the Facility every day from April 8, 2010, to the present.

324.   The Facility Owner's and/or Operator's violations of Section A and Provision E(2) of the Storm Water Permit and the CWA at the Facility are ongoing and continuous.

325.   The Facility Owners and/or Operators will continue to be in violation of Section A and Provision E(2) of the Storm Water Permit and the CWA each and every day the Facility Owners and/or Operators fail to adequately develop, implement, and/or revise the SWPPP for the Facility.

326.   Each and every violation of the Storm Water Permit's SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

327.   By committing the acts and omissions alleged above, the Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from April 8, 2010, to the present, pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

328.    An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA and the citizens of the State of California, for which harm CSPA has no plain, speedy, or adequate remedy at law.

WHEREFORE, Plaintiff prays for judgment against the Defendants as set forth hereafter.

### FIFTH CAUSE OF ACTION

**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Monitoring and Reporting Program in Violation of the Storm Water Permit and the Clean Water Act. 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

329.    CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

330.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed and continue to fail to develop an adequate M&RP for the Facility, in violation of Section B and Provision E(3) of the Storm Water Permit.

331.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed and continue to fail to adequately implement an M&RP for the Facility, in violation of Section B and Provision E(3) of the Storm Water Permit.

332.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed and continue to fail to adequately revise an M&RP for the Facility, in violation of Section B and Provision E(3) of the Storm Water Permit.

333.    The Facility Owners and/or Operators have been in violation of the Section B and Provision E(3) of the Storm Water Permit at the Facility every day from April 8, 2010, to the present.

334.    The Facility Owner's and/or Operator's violations of Section B and Provision E(3) of the Storm Water Permit and the CWA at the Facility are ongoing and continuous.

335.    The Facility Owners and/or Operators will continue to be in violation of Section B and Provision E(3) the Storm Water Permit and the CWA each and every day it fails to adequately develop, implement, and/or revise an M&RP for the Facility.

336.    Each and every violation of the Storm Water Permit's M&RP requirements at the Facility is a separate and distinct violation of the CWA.

337.    By committing the acts and omissions alleged above, the Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from April 8, 2010, to the present, pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

338.    An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA and the citizens of the State of California, for which harm CSPA has no plain, speedy, or adequate remedy at law.

WHEREFORE, Plaintiff prays for judgment against the Defendants as set forth hereafter.

### SIXTH CAUSE OF ACTION
**Defendants' Failure to Report as Required by the Storm Water Permit in Violation of the Storm Water Permit and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

339.    CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

340.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed and continue to fail to submit accurate Annual Reports to the Regional Board, in violation of Sections B(14), C(9), and C(10) of the Storm Water Permit.

341.    CSPA is informed and believes, and thereon alleges, that the Facility Owner's and/or Operator's Annual Reports failed and continue to fail to meet the monitoring and reporting requirements of the Storm Water Permit, in violation of Section B(14) of the Storm Water Permit.

342.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed and continue to fail to submit complete Annual Reports to the Regional Board, in violation of Sections B(14), C(9), C(10) and C(11) of the Storm Water Permit.

343.    CSPA is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed and continue to fail to report its non-compliance with the Storm Water Permit in its Annual Reports to the Regional Board, in violation of Sections B(14), C(9), C(10) and C(11) of the Storm Water Permit.

344.    The Facility Owners and/or Operators have been in violation of Sections B(14), C(9),

1   C(10), and/or C(11) of the Storm Water Permit and CWA every day since at least April 8, 2010.

2          345.    The Facility Owners' and/or Operators' violations of the reporting requirements of the

3   Storm Water Permit and the CWA are ongoing and continuous.

4          346.    By committing the acts and omissions alleged above, the Facility Owners and/or

5   Operators are subject to an assessment of civil penalties for each and every violation of the CWA

6   occurring from April 8, 2010, to the present, pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C.

7   §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

8          347.    An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a).

9   Continuing commission of the acts and omissions alleged above would irreparably harm CSPA and the

10  citizens of the State of California, for which harm CSPA has no plain, speedy, or adequate remedy at

11  law.

12         WHEREFORE, Plaintiff prays for judgment against the Defendants as set forth hereafter.

13  **VI.      RELIEF REQUESTED**

14         348.    Plaintiff respectfully requests that this Court grant the following relief:

15         a.      A Court order declaring Defendants to have violated and to be in violation of the Storm

16  Water Permit and Sections 301(a) and 402(p) of the CWA, 33 U.S.C. § 1311(a), for its discharges of

17  pollutants not in compliance with the Storm Water Permit and its violations of the substantive and

18  procedural requirements of the Storm Water Permit;

19         b.      A Court order enjoining Defendants from violating the substantive and procedural

20  requirements of the Storm Water Permit;

21         c.      A Court order requiring Defendants to develop and implement affirmative injunctive

22  measures to eliminate Defendants' violations of the substantive and procedural requirements of the

23  Storm Water Permit and the Clean Water Act;

24         d.      A Court order assessing civil monetary penalties for each violation of the CWA at

25  $37,500 per day per violation for violations occurring since April 8, 2010, as permitted by 33 U.S.C.

26  § 1319(d) and 40 C.F.R. § 19.4;

27         e.      A Court order awarding Plaintiff its reasonable costs of suit, including attorney, witness,

28  expert, and consultant fees, as permitted by section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d);

1 | and

2 |       f.      Any other relief as this Court may deem appropriate.

3 |

4 | Dated: April 3, 2015                             Respectfully submitted,

5 |                                            LAWYERS FOR CLEAN WATER, INC.

6 |

7 |

8 |                                          Caroline Koch

9 |                                          Attorney for Plaintiff<br>California Sportfishing Protection Alliance

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

**Exhibit 1**



February 3, 2015


**VIA CERTIFIED MAIL**

Security Contractor Services, Inc.          H&H Properties
Managing Agent                              Fred Honore
5339 Jackson Street                         P.O. Box 543
North Highlands, California 95660           San Jose, California 95106

**VIA UNITED STATES MAIL**

Corporation Service Company Which Will Do    George Honore
Business In California As CSC - Lawyers       Registered Agent for H&H Properties
Incorporating Service                         1350 E. St. James Street
Registered Agent for Security Contractor      San Jose, California 95116
Services, Inc.
2710 Gateway Oaks Drive
Suite 150N
Sacramento, California 95833


**Re:    Notice of Violation and Intent to File Suit Under the Clean Water Act**

To Whom It May Concern:

     I am writing on behalf of California Sportfishing Protection Alliance ("CSPA") regarding violations of the Clean Water Act[1] and California's General Industrial Storm Water Permit[2] occurring at the Security Contractor Services, Inc. facility located at 5339 Jackson Street, North Highlands, California 95660 (hereinafter the "Security Contractor Services Facility" or "Facility"). The purpose of this letter is to put the owners and operators of the Security Contractor Services Facility on notice of the violations of the Storm Water Permit that have occurred, and continue to occur, at the Facility including, but not limited to, the discharges of

---

[1] Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*
[2] National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001 [State Water Resources Control Board] Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ (hereinafter "Storm Water Permit").

polluted storm water from the Facility into local water bodies. Violations of the Storm Water Permit are violations of the Clean Water Act. As explained below, the owners and/or operators of the Facility are liable for violations of the Storm Water Permit and the Clean Water Act.

Section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b), requires that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a), a citizen must give notice of his/her intention to sue. Notice must be given to the alleged violator, the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, the Executive Officer of the water pollution control agency in the State in which the violations occur, and, if the alleged violator is a corporation, the registered agent of the corporation. *See* 40 C.F.R. § 135.2. This letter is being sent to you as a Security Contractor Services Facility owner and/or operator, or as the registered agent for this entity. By this letter, issued pursuant to 33 U.S.C. §§ 1365(a) and (b) of the Clean Water Act, CSPA puts the Facility owners and/or operators on notice that after the expiration of sixty (60) days from the date of this letter, we intend to file an enforcement action in federal court for violations of the Storm Water Permit and the Clean Water Act at the Facility.

## I.     Background.

### A.     California Sportfishing Protection Alliance.

CSPA is a 501(c)(3) non-profit public benefit conservation and research organization. CSPA was established in 1983 for the purpose of conserving, restoring, and enhancing the state's water quality, wildlife, fishery resources, aquatic ecosystems, and associated riparian habitats. CSPA accomplishes its mission by actively seeking federal, state, and local agency implementation of environmental regulations and statutes and routinely participates in administrative, legislative, and judicial proceedings. When necessary, CSPA directly initiates enforcement actions on behalf of itself and its members to protect public trust resources. CSPA's office is located at 3536 Rainier Avenue, Stockton, California 95204.

The owners and/or operators of the Security Contractor Services Facility have discharged, and continue to discharge, polluted storm water to Magpie Creek, which flows to Steelhead Creek, then to the Sacramento River, and then to the Sacramento-San Joaquin River Delta ("Delta") (collectively "Receiving Waters"). The Facility's discharges of polluted storm water degrade water quality and harm aquatic life in the Receiving Waters. Members of CSPA live, work, and/or recreate near the Receiving Waters. For example, CSPA members use and enjoy the Receiving Waters for fishing, boating, swimming, bird watching, picnicking, viewing wildlife, and engaging in scientific study. The unlawful discharge of pollutants from the Security Contractor Services Facility impairs each of these uses. Further, the Facility's discharges of polluted storm water are ongoing and continuous. As a result, CSPA's members' use and enjoyment of the Receiving Waters has been and continues to be adversely impacted. Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by the failure of the Facility owner and/or operator to comply with the Storm Water Permit and the Clean Water Act.

### B.    The Owners and/or Operators of the Security Contractor Services Facility.

Information available to CSPA indicates that Security Contractor Services, Inc. is an active corporation registered to operate in California since 1961. Information available to CPSA indicates that Security Contractor Services, Inc. has been an owner and/or operator of the Facility since at least 2004.

Information available to CSPA indicates that H&H Properties is an active limited liability company registered to operate in California since 2008. Information available to CPSA indicates that H&H Properties has been an owner and/or operator of the Facility since at least 2004. Security Contractor Services, Inc. and H&H Properties are hereinafter referred to as the Security Contractor Services Owners and/or Operators.

The Registered Agent for Security Contractor Services, Inc. is Corporation Service Company Which Will Do Business In California As CSC - Lawyers Incorporating Service located at 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 95833. The Registered Agent for H&H Properties is George Honore located at 1350 E. St. James Street, San Jose, California 95116.

### C.    The Security Contractor Services Facility's Coverage Under the Storm Water Permit.

A Notice of Intent ("NOI") to obtain Storm Water Permit coverage for metal and fabricated wire manufacturing at the Security Contractor Services Facility was first submitted to the State Water Resources Control Board ("State Board") in January 2004. The NOI lists the Facility operator as H&H Properties at PO Box 547, San Jose, California 95106. The NOI lists the Facility name as Security Contractor Services located at 5339 Jackson Street, North Highlands, California 95660 consisting of approximately 6.42 acres 90% of which is impervious. Upon receipt of the NOI, the Facility was assigned Waste Discharger Identification number 5S34I018621.

The NOI lists the Standard Industrial Classification Codes for the Security Contractor Services Facility as 3446 (metal work manufacturing) and 3496 (fabricated wire manufacturing). The Storm Water Permit regulates SIC code 3446 and 3496 facilities where industrial materials, equipment, or activities are exposed to storm water. *See* Storm Water Permit, Attachment 1, ¶ 10.

### D.    Storm Water Pollution and Its Impacts on the Sacramento-San Joaquin Delta Watershed.

With every significant rainfall event, millions of gallons of polluted rainwater, originating from industrial facilities such as the Security Contractor Services Facility, pour into storm drains and surface waters in California. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year. This discharge of pollutants, which includes discharges from industrial facilities, contributes to the impairment of downstream waters and aquatic dependent wildlife.

Polluted storm water discharges from metal and fabricated wire manufacturing facilities can carry pollutants such as total suspended solids ("TSS"), oil and grease ("O&G"), pH-affecting substances, aluminum, iron, zinc, and nitrates plus nitrites as nitrogen ("N+N"). Many of these pollutants are on the list of chemicals published by the State of California as known to cause cancer, birth defects, and developmental or reproductive harm. Polluted storm water discharges to surface waters pose carcinogenic and reproductive toxicity threats to the public and adversely affect the aquatic environment.

The California Regional Water Quality Control Board, Central Valley Region ("Regional Board") has issued its Water Quality Control Plan for the Sacramento and San Joaquin River Basins ("Basin Plan"). The Basin Plan identifies the "Beneficial Uses" of water bodies in the region. The Beneficial Uses for the waters that receive polluted storm water discharges from the Security Contractor Services Facility include: Municipal and Domestic Supply, Agricultural Supply, Industrial Processes Supply, Industrial Service Supply, Water Contact Recreation, Non-contact Water Recreation, Warm Freshwater Habitat, Cold Freshwater Habitat, Migration, Spawning, Wildlife Habitat, Navigation. *See* Basin Plan at Table II-1.

A water body is impaired pursuant to section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d), when its Beneficial Uses are not being achieved due to the presence of one or more pollutants. Downstream of the Facility, the Sacramento River and the Delta are impaired by, among other things, various pesticides, mercury, and/or unknown toxicity.[3] Polluted storm water discharges from industrial facilities, such as the Security Contractor Services Facility, contribute to the impairment of surface waters, including the Receiving Waters, and harm aquatic dependent wildlife.

E.     **The Industrial Activities at the Security Contractor Services Facility and Associated Pollutants.**

Based on CSPA's review of publicly available information, the Facility includes industrial operations occurring on the property located at 5339 and 5311 Jackson Street. Information available to CSPA indicates that the following industrial operations are conducted at the Facility: metals manufacturing, fabricated wire manufacturing, materials and waste storage, operational activities, equipment and parts storage, and facility maintenance. Information available to CSPA indicates that these activities are exposed to storm water.

Each of these activities or materials is a potential source of pollutants at the Facility. Information available to CSPA indicates that many, if not all, of the industrial operations and associated material storage at the Facility are conducted outdoors without adequate cover or other effective best management practices ("BMPs") to prevent storm water exposure to pollutant sources, and without adequate secondary containment or other measures to prevent polluted storm water from discharging from the Facility.

---

[3] 2010 Integrated Report – All Assessed Waters, available at:
http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2010.shtml (last accessed on March 20, 2014).

The pollutants associated with operations at the Security Contractor Services Facility include, but are not limited to: TSS, O&G, pH-affecting substances, oxygen-depleting chemicals, aluminum, iron, zinc, and N+N.

Information available to CSPA also indicates that the pollutants and pollutant sources identified above have been and continue to be deposited in and around and/or tracked throughout the Facility. Pollutants accumulate at the storm water discharge points and drop inlets to the onsite storm drain system. They also accumulate at and on the driveways to Jackson Street, resulting in the discharge of pollutants at the driveways as well as tracking of sediment, dirt, oil and grease, metal particles and other pollutants off-site.

**F.** **The Security Contractor Services Facility's Failure to Implement BMPs and Associated Discharges of Pollutants.**

The Security Contractor Services Facility Owners and/or Operators report that there are at least 2 discharge locations at the Facility, which are labeled as DP-1 and DP-2 in the Facility Annual Reports. As explained in the 2011/2012 Annual Report, there is an additional discharge location that discharges directly to Magpie Creek located on the northern portion of the Facility in the Rental Storage Yard area. The Security Contractor Services Facility Owners and/or Operators have collected storm water samples from DP-1 and DP-2, as well as from an additional sampling location labeled "SP-1," which may be an additional discharge location.

Information available to CSPA further indicates that the driveways from the Facility onto Jackson Street are discharge locations. There are at least 4 driveway discharge locations: 2 driveways allowing entrance and egress from the portion of the Facility located at 5339 Jackson Street and 2 driveways allowing entrance and egress from the portion of the Facility located at 5311 Jackson Street.

The Security Contractor Services Facility Owners and/or Operators have not properly developed and/or implemented the required BMPs to address pollutant sources, prevent the exposure of pollutants to storm water, and prevent the subsequent discharge of polluted storm water from the Facility during rain events. Consequently, during rain events, storm water carries pollutants from the Facility's uncovered and exposed areas of industrial activity into the Receiving Waters. These discharges negatively impact the Receiving Waters and CSPA's members' use and enjoyment of the Receiving Waters.

The Security Contractor Services Facility Owners' and/or Operators' failure to develop and/or implement BMPs required by the Storm Water Permit to reduce or eliminate pollutant levels in discharges is also documented by the Regional Board. In 2006, 2007, and 2008, the Regional Board issued "Failure to Comply with the General Permit for Storm Water Discharges Associated with Industrial Activities" notices to the Security Contractor Services Facility Owners and/or Operators informing them that they failed to file the required Annual Reports, which are meant to allow permittees to evaluate a facility's BMPs. Further, on May 1, 2008, and October 23, 2009, in response to the Facility's submittal of Annual Reports including storm water sampling data, the Regional Board notified the Security Contractor Services Facility

Owners and/or Operators that the levels of pollutants in the Facility storm water indicate that current BMPs are not sufficient to comply with the Storm Water Permit requirements, and required the Security Contractor Services Facility Owners and/or Operators to modify the Facility BMPs and submit a responsive report. While, on November 30, 2009, the Security Contractor Services Facility Owners and/or Operators submitted a cursory report in response to the Regional Board's October 23 letter that proposed BMP improvements, concentrations of pollutants in the Facility storm water discharges, including in the 2013/2014 wet season, continue to demonstrate that the Facility BMPs do not comply with the Permit terms.

## II.     Violations of the Clean Water Act and the Storm Water Permit.

In California, any person who discharges storm water associated with industrial activity must comply with the terms of the Storm Water Permit in order to lawfully discharge pollutants. *See* 33 U.S.C. §§ 1311(a), 1342; 40 C.F.R. § 122.26(c)(1); *see also* Storm Water Permit, Fact Sheet at VII.

### A.     Discharges of Polluted Storm Water from the Security Contractor Services Facility in Violation of Effluent Limitation B(3) of the Storm Water Permit.

Effluent Limitation B(3) of the Storm Water Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through implementation of BMPs that achieve best available technology economically achievable ("BAT") for toxic pollutants[4] and best conventional pollutant control technology ("BCT") for conventional pollutants.[5]  Benchmark Levels are relevant and objective standards to evaluate whether a permittee's BMPs achieve compliance with BAT/BCT standards as required by Effluent Limitation B(3) of the Storm Water Permit.[6]

Sampling at the Security Contractor Services Facility establishes the repeated and significant exceedances of Benchmark Levels, which demonstrates that the Security Contractor Services Facility Owners and/or Operators have not implemented BMPs at the Facility that achieve compliance with the BAT/BCT standards. *See* Exhibit A. The Security Contractor Services Facility Owners and/or Operators have failed and continue to fail to develop and/or implement BMPs to prevent the exposure of pollutants to storm water and to prevent discharges of polluted storm water from the Facility, in violation of Effluent Limitation B(3) of the Storm Water Permit.

Further, each year since the 2011/2012 Annual Report the Security Contractor Services Facility Owners and/or Operators have self-reported that the Facility is not in compliance with the Permit due to failure to develop and/or implement adequate BMPs.

---

[4] Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others.
[5] Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand, total suspended solids, oil and grease, pH, and fecal coliform.
[6] *See* EPA Storm Water Multi-Sector Permit (2008), Fact Sheet, p. 106; *see also*, EPA Storm Water Multi-Sector Permit, 65 Federal Register 64839 (2000).

Information available to CSPA indicates that the Security Contractor Services Facility Owners and/or Operators violate Effluent Limitation B(3) of the Storm Water Permit for failing to develop and/or implement BMPs that achieve BAT/BCT each time storm water is discharged from the Facility. *See e.g.*, Exhibit B (setting forth dates of rain events resulting in a discharge at the Facility).[7] These discharge violations are ongoing and will continue each day the Security Contractor Services Facility Owners and/or Operators discharge polluted storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards. CSPA will update the number and dates of violation when additional information and data becomes available. Each time the Security Contractor Services Facility Owners and/or Operators discharge polluted storm water in violation of Effluent Limitation B(3) of the Storm Water Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a). The Security Contractor Services Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since February 3, 2010.

**B.** **Discharges of Polluted Storm Water in Violation of Receiving Water Limitations C(1) and C(2) of the Storm Water Permit.**

Receiving Water Limitation C(1) of the Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges to surface water or ground water that adversely impact human health or the environment. Discharges that contain pollutants in concentrations that exceed levels known to adversely impact aquatic species and the environment constitute violations of Receiving Water Limitation C(1) of the Storm Water Permit and the Clean Water Act. Receiving Water Limitation C(2) of the Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of an applicable water quality standard ("WQS").[8] Discharges that contain pollutants in excess of an applicable WQS violate Receiving Water Limitation C(2) of the Storm Water Permit and the Clean Water Act.

Information available to CSPA indicates that the Facility's storm water discharges contain elevated concentrations of pollutants, including but not limited to TSS, O&G, pH-affecting substances, oxygen-depleting chemicals, aluminum, iron, zinc, and N+N, which can be acutely toxic and/or have sub-lethal impacts on the avian and aquatic wildlife in the Receiving Waters. Discharges of elevated concentrations of pollutants in the storm water from the Facility also adversely impact human health. These harmful discharges from the Security Contractor Services Facility are violations of Receiving Water Limitation C(1).

---

[7] Exhibit B sets forth dates of significant rain events as measured at the Arcade Creek at Winding Way rain gauge. A significant rain event is defined by EPA as a rainfall event generating 0.1 inches or more of rainfall, which generally results in measurable discharges at a typical industrial facility.

[8] As explained above in Section I.D, the Basin Plan designates Beneficial Uses for the Receiving Waters. Water quality standards are pollutant concentration levels determined by the state or federal agencies to be protective of designated Beneficial Uses. Discharges above water quality standards contribute to the impairment of the Receiving Waters' Beneficial Uses. Applicable water quality standards include, among others, the Criteria for Priority Toxic Pollutants in the State of California, 40 C.F.R. § 131.38 ("CTR"), and the water quality objectives in the Basin Plan.

Information available to CSPA further indicates that the Facility's storm water discharges contain concentrations of pollutants that cause or contribute to an exceedance of applicable WQSs, in violation of Receiving Water Limitation C(2). *See, e.g.,* Exhibit A. Storm water discharges from the Facility that cause or contribute to exceedances of WQSs are violations of Receiving Water Limitation C(2).

Information available to CSPA indicates that the storm water discharges from the Security Contractor Services Facility violate Receiving Water Limitations C(1) and/or C(2) each time storm water is discharged from the Facility. These violations are ongoing, and will continue each time contaminated storm water is discharged in violation of the Receiving Water Limitation C(1) and/or C(2) of the Storm Water Permit. Each time discharges of storm water from the Facility adversely impact human health or the environment is a separate and distinct violation of Receiving Water Limitation C(1) of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a). Each time discharges of storm water from the Facility cause or contribute to a violation of an applicable WQS is a separate and distinct violation of Receiving Water Limitation C(2) of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a). CSPA will update the number and dates of violation when additional information becomes available. The Security Contractor Services Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since February 3, 2010.

**C.    Failure to Develop, Implement, and/or Revise an Adequate Storm Water Pollution Prevention Plan.**

Section A(1) and Provision E(2) of the Storm Water Permit require dischargers to have developed and implemented a SWPPP by October 1, 1992, or prior to beginning industrial activities, that meets all of the requirements of the Storm Water Permit. The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges from the Facility, and to implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges. *See* Storm Water Permit, Section A(2). These BMPs must achieve compliance with the Storm Water Permit's Effluent Limitations and Receiving Water Limitations. To ensure compliance with the Storm Water Permit, the SWPPP must be evaluated on an annual basis pursuant to the requirements of Section A(9), and must be revised as necessary to ensure compliance with the Storm Water Permit. *Id.*, Sections A(9) and (10).

Sections A(3) – A(10) of the Storm Water Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a site map showing the facility boundaries, storm water drainage areas with flow patterns, nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, areas of actual and potential pollutant contact, and areas of industrial activity (*see* Storm Water Permit, Section A(4)); a list of significant materials handled and stored at the site (*see* Storm Water Permit, Section A(5)); a description of potential pollutant sources, including industrial processes, material handling and storage areas, dust and particulate generating activities, significant spills and leaks, non-storm water discharges and their sources, and locations where soil erosion may

occur (*see* Storm Water Permit, Section A(6)). Sections A(7) and A(8) of the Storm Water Permit require an assessment of potential pollutant sources at the facility and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective.

Information available to CSPA indicates that Security Contractor Services Facility Owners and/or Operators have been conducting operations at the Facility with an inadequately developed and/or implemented SWPPP. For example, the Security Contractor Services Facility Owners and/or Operators failed to create a site map that includes all the information required by Section A(4) of the Storm Water Permit, such as the direction of flow on the Facility, locations where materials are directly exposed to precipitation, locations where significant spills or leaks have occurs, or the areas of industrial activities. The Security Contractor Services Facility Owners and/or Operators have also failed and continue to fail to develop and/or implement a SWPPP that contains BMPs to prevent the exposure of pollutant sources to storm water and the subsequent discharge of polluted storm water from the Facility, as required by the Storm Water Permit. The SWPPP inadequacies are documented by the continuous and ongoing discharge of storm water containing pollutant levels in violation of the Storm Water Permit. *See, e.g.,* Exhibit A.

The Security Contractor Services Facility Owners and/or Operators have also not revised the SWPPP as required by the Storm Water Permit. For example, in response to the Regional Board's October 23 letter, the Security Contractor Services Facility Owners and/or Operators were required to modify the Facility SWPPP to address Benchmark Level exceedances in the Facility's storm water samples. However, as of the 2013/2014 wet season the concentrations of pollutants in storm water discharges from the Facility continue to exceed Benchmark Levels demonstrating that any SWPPP revisions have not achieved compliance with the Permit.

Further, each year since the 2011/2012 Annual Report the Security Contractor Services Facility Owners and/or Operators have self-reported that the Facility is not in compliance with the Permit due to failure to develop and/or implement an adequate SWPPP.

The Security Contractor Services Facility Owners and/or Operators have failed to adequately develop, implement, and/or revise a SWPPP, in violation of Section A and Provision E(2) of the Storm Water Permit. Every day the Facility operates with an inadequately developed, implemented, and/or properly revised SWPPP is a separate and distinct violation of the Storm Water Permit and the Clean Water Act. The Security Contractor Services Facility Owners and/or Operators have been in daily and continuous violation of the Storm Water Permit's SWPPP requirements since at least February 3, 2010. These violations are ongoing, and CSPA will include additional violations when information becomes available. The Security Contractor Services Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since February 3, 2010.

    **D.**     **Failure to Develop, Implement, and/or Revise an Adequate Monitoring and Reporting Program.**

Section B(1) and Provision E(3) of the Storm Water Permit require facility operators to develop and implement an adequate M&RP by October 1, 1992, or prior to the commencement of industrial activities at a facility, that meets all of the requirements of the Storm Water Permit. The primary objective of the M&RP is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. *See* Storm Water Permit, Section B(2). The M&RP must therefore ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility, and must be evaluated and revised whenever appropriate to ensure compliance with the Storm Water Permit. *Id.*

Sections B(3) – B(16) of the Storm Water Permit set forth the M&RP requirements. Specifically, Section B(3) requires dischargers to conduct quarterly visual observations of all drainage areas within their facility for the presence of authorized and unauthorized non-storm water discharges. Section B(4) requires dischargers to conduct visual observations of storm water discharges from one storm event per month during the Wet Season. Sections B(3) and B(4) further require dischargers to document the presence of any floating or suspended material, oil and grease, discolorations, turbidity, odor, and the source of any pollutants. Dischargers must maintain records of observations, observation dates, locations observed, and responses taken to eliminate unauthorized non-storm water discharges and to reduce or prevent pollutants from contacting non-storm water and storm water discharges. *See* Storm Water Permit, Sections B(3) and B(4). Dischargers must also revise the SWPPP in response to these observations to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. *Id.*, Section B(4).

Sections B(5) and B(7) of the Storm Water Permit require dischargers to collect samples of storm water from all locations where storm water is discharged. Storm water samples must be analyzed for TSS, pH, specific conductance, total organic carbon or oil and grease, and other pollutants that are likely to be present in the facility's discharges in significant quantities. *See* Storm Water Permit, Section B(5)(c). The Storm Water Permit requires facilities classified as SIC Code 3496, such as the Facility, to also analyze storm water samples for Aluminum, Iron, Nitrate Plus Nitrite, and Zinc. *Id.*; *see also* Storm Water Permit, Table D, Sector AA.

Information available to CSPA, including review of Annual Reports, indicates that the Security Contractor Services Facility Owners and/or Operators have been conducting operations at the Facility with an inadequately developed and/or implemented M&RP, and have failed to revise the M&RP as required by the Storm Water Permit. Specifically, as indicated in several of the Annual Reports submitted by the Security Contractor Services Facility Owners and/or Operators, the Facility operators have not been properly trained to implement the required storm water and non-storm water visual inspections or monitoring activities. The Security Contractor Services Facility Owners and/or Operators have also failed to document the presence of any floating or suspended material, oil and grease, discolorations, turbidity, odor, and the source of any pollutants when conducting visual observations.

The Security Contractor Services Facility Owners and/or Operators are also not collecting or analyzing samples as required by the Storm Water Permit. For example, the Security Contractor Services Facility Owners and/or Operators have failed to collect storm water samples from all discharge locations within the first hour of discharge, have failed to sample all discharge locations for all required parameters, and have failed to collect samples from the first rain event of a wet season. In addition, the Security Contractor Services Facility Owners and/or Operators have failed and continue to fail to follow proper storm water analysis and/or reporting procedures, as required by Storm Water Permit, Section B.10.b. and 40 C.F.R. § 136.3. These failures to comply with the Storm Water Permit's requirements demonstrate the inadequacies of the M&RP and the failure to properly implement the M&RP at the Facility.

The Security Contractor Services Facility Owners' and/or Operators' failure to conduct sampling, monitoring, and reporting as required by the Storm Water Permit demonstrates that they have failed to develop, implement, and/or revise an M&RP that complies with the requirements of Section B and Provision E(3) of the Storm Water Permit. Every day that the Security Contractor Services Facility Owners and/or Operators conduct operations in violation of the specific monitoring and reporting requirements of the Storm Water Permit, or with an inadequately developed and/or implemented M&RP, is a separate and distinct violation of the Storm Water Permit and the Clean Water Act. The Security Contractor Services Facility Owners and/or Operators have been in daily and continuous violation of the Storm Water Permit's M&RP requirements every day since at least February 3, 2010. These violations are ongoing, and CSPA will include additional violations when information becomes available. The Security Contractor Services Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since February 3, 2010.

### E.    Failure to Comply with the Storm Water Permit's Reporting Requirements.

Section B(14) of the Storm Water Permit requires a permittee to submit an Annual Report to the Regional Board by July 1 of each year. Section B(14) requires that the Annual Report include a summary of visual observations and sampling results, an evaluation of the visual observation and sampling results, the laboratory reports of sample analysis, the annual comprehensive site compliance evaluation report, an explanation of why a permittee did not implement any activities required, and other information specified in Section B(13).

The Security Contractor Services Facility Owners and/or Operators have failed to submit Annual Reports that comply with the Storm Water Permit reporting requirements, including filing incomplete Annual Reports that do not provide the information required by the Storm Water Permit. For example, the 2009/2010 and 2010/2011 Annual Reports indicate that: (1) a complete Annual Comprehensive Site Compliance Evaluation was done pursuant to Section A(9) of the Storm Water Permit; (2) the SWPPP's BMPs address existing potential pollutant sources; and (3) the SWPPP complies with the Storm Water Permit, or will otherwise be revised to achieve compliance. However, information available to CSPA, including a review of the Regional Board's files and the Facility storm water sampling data, indicates that these certifications by the Security Contractor Services Facility Owners and/or Operators are erroneous, because they had not developed and/or implemented adequate BMPs or revised the

SWPPP, resulting in the ongoing discharge of storm water containing pollutant levels in violation of the Storm Water Permit limitations. In fact, Annual Reports document the need for additional BMPs, or improvements to current BMPs, yet the compliance certifications note all required BMPs are in place and working as intended.

Information available to CSPA indicates that the Security Contractor Services Facility Owners and/or Operators have submitted incomplete and/or incorrect Annual Reports that fail to comply with the Storm Water Permit. As such, the Security Contractor Services Facility Owners and/or Operators is in daily violation of the Storm Water Permit. Every day the Security Contractor Services Facility Owners and/or Operators conduct operations at the Facility without reporting as required by the Storm Water Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a). The Security Contractor Services Facility Owners and/or Operators have been in daily and continuous violation of the Storm Water Permit's reporting requirements every day since at least February 3, 2010. These violations are ongoing. The Security Contractor Services Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since February 3, 2010.

### III.    Relief and Penalties Sought for Violations of the Clean Water Act.

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five years prior to the date of a notice of intent to file suit letter. These provisions of law authorize civil penalties of up to $37,500 per day per violation for all Clean Water Act violations. In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. §1365(a) and (d), declaratory relief, and such other relief as permitted by law. Lastly, pursuant to Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), CSPA will seek to recover its costs, including attorneys' and experts' fees, associated with this enforcement action.

### IV.    Conclusion.

Upon expiration of the 60-day notice period, CSPA will file a citizen suit under Section 505(a) of the Clean Water Act for the Security Contractor Services Facility Owner's and/or Operator's violations of the Storm Water Permit. During the 60-day notice period, however, CSPA is willing to discuss effective remedies for the violations noted in this letter. If you wish to pursue such discussions please contact CSPA's legal counsel as listed below.

Drevet Hunt
    drev@lawyersforcleanwater.com
Caroline Koch
    caroline@lawyersforcleanwater.com
Lawyers for Clean Water, Inc.
1004-A O'Reilly Avenue

San Francisco, California 94129
Tel: (415) 440-6520

Sincerely,

Bill Jennings, Executive Director
California Sportfishing Protection Alliance

## SERVICE LIST

Eric H. Holder, Jr.
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Gina McCarthy
Administrator
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Thomas Howard
Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, California 95812-0100

Jared Blumenfeld
Regional Administrator
U.S. Environmental Protection Agency
Region IX
75 Hawthorne Street
San Francisco, California 94105

Pamela Creedon
Executive Officer
Central Valley Regional Water Quality Control Board
11020 Sun Center Drive #200
Rancho Cordova, California 95670-6114

**Exhibit A**

| Date/time of sample collection | Parameter | Sample Location | Result | Units | Benchmark | Magnitude of Benchmark Exceedance | Water Quality Objective | Magnitude of WQO Exceedance |
|---|---|---|---|---|---|---|---|---|
| **2009/2010 Wet Season** | | | | | | | | |
| 11/20/09 0:00 | Aluminum Total | SP-1 | 7.76 | mg/L | 0.75 | 10.35 | none | N/A |
| 11/20/09 0:00 | Electrical Conductivity @ 25 Deg. C | SP-1 | 182 | umhos/cm | 200 | 0 | none | N/A |
| 11/20/09 0:00 | Iron Total | SP-1 | 9.29 | mg/L | 1 | 9.29 | 0.3 | 30.97 |
| 11/20/09 0:00 | Nitrite Plus Nitrate (as N) | SP-1 | 1.95 | mg/L | 0.68 | 2.87 | none | N/A |
| 11/20/09 0:00 | Oil and Grease | SP-1 | <10 | mg/L | 15 | 0 | none | N/A |
| 11/20/09 0:00 | pH | SP-1 | 9.17 | SU | 6.0-9.0 | 0 | 6.5-8.5 | 0.67 |
| 11/20/09 0:00 | Total Suspended Solids (TSS) | SP-1 | 199 | mg/L | 100 | 1.99 | none | N/A |
| 11/20/09 0:00 | Zinc Total | SP-1 | 6.45 | mg/L | 0.11 | 58.64 | 0.12 | 53.75 |
| 11/20/09 0:00 | Aluminum Total | DP-2 | 0.492 | mg/L | 0.75 | 0 | none | N/A |
| 11/20/09 0:00 | Electrical Conductivity @ 25 Deg. C | DP-2 | 53.5 | umhos/cm | 200 | 0 | none | N/A |
| 11/20/09 0:00 | Iron Total | DP-2 | 1.03 | mg/L | 1 | 1.03 | 0.3 | 3.43 |
| 11/20/09 0:00 | Nitrite Plus Nitrate (as N) | DP-2 | 0.375 | mg/L | 0.68 | 0 | none | N/A |
| 11/20/09 0:00 | Oil and Grease | DP-2 | <10 | mg/L | 15 | 0 | none | N/A |
| 11/20/09 0:00 | pH | DP-2 | 7.62 | SU | 6.0-9.0 | 0 | 6.5-8.5 | 0 |
| 11/20/09 0:00 | Total Suspended Solids (TSS) | DP-2 | <15 | mg/L | 100 | 0 | none | N/A |
| 11/20/09 0:00 | Zinc Total | DP-2 | 0.439 | mg/L | 0.11 | 3.99 | 0.12 | 3.66 |
| 2/23/10 14:30 | Aluminum Total | DP-1 | 1.09 | mg/L | 0.75 | 1.45 | none | N/A |

| Date/time of sample collection | Parameter | Sample Location | Result | Units | Benchmark | Magnitude of Benchmark Exceedance | Water Quality Objective | Magnitude of WQO Exceedance |
|---|---|---|---|---|---|---|---|---|
| 2/23/10 14:30 | Electrical Conductivity @ 25 Deg. C | DP-1 | 69.1 | umhos/cm | 200 | 0 | none | N/A |
| 2/23/10 14:30 | Iron Total | DP-1 | 1.73 | mg/L | 1 | 1.73 | 0.3 | 5.77 |
| 2/23/10 14:30 | Nitrite Plus Nitrate (as N) | DP-1 | 1.675 | mg/L | 0.68 | 2.46 | none | N/A |
| 2/23/10 14:30 | Oil and Grease | DP-1 | <10 | mg/L | 15 | 0 | none | N/A |
| 2/23/10 14:30 | pH | DP-1 | 7.26 | SU | 6.0-9.0 | 0 | 6.5-8.5 | 0 |
| 2/23/10 14:30 | Total Suspended Solids (TSS) | DP-1 | 35 | mg/L | 100 | 0 | none | N/A |
| 2/23/10 14:30 | Zinc Total | DP-1 | 0.74 | mg/L | 0.11 | 6.73 | 0.12 | 6.17 |
| 2/23/10 14:35 | Aluminum Total | DP-2 | 0.127 | mg/L | 0.75 | 0 | none | N/A |
| 2/23/10 14:35 | Electrical Conductivity @ 25 Deg. C | DP-2 | 257 | umhos/cm | 200 | 1.29 | none | N/A |
| 2/23/10 14:35 | Iron Total | DP-2 | 0.797 | mg/L | 1 | 0 | 0.3 | 2.66 |
| 2/23/10 14:35 | Nitrite Plus Nitrate (as N) | DP-2 | 0.985 | mg/L | 0.68 | 1.45 | none | N/A |
| 2/23/10 14:35 | Oil and Grease | DP-2 | <10 | mg/L | 15 | 0 | none | N/A |
| 2/23/10 14:35 | pH | DP-2 | 7.09 | SU | 6.0-9.0 | 0 | 6.5-8.5 | 0 |
| 2/23/10 14:35 | Total Suspended Solids (TSS) | DP-2 | <15 | mg/L | 100 | 0 | none | N/A |
| 2/23/10 14:35 | Zinc Total | DP-2 | 0.38 | mg/L | 0.11 | 3.45 | 0.12 | 3.17 |
| **2010/2011 Wet Season** | | | | | | | | |
| 2/24/11 9:30 | Aluminum Total | DP-1 | 0.677 | mg/L | 0.75 | 0 | none | N/A |
| 2/24/11 9:30 | Electrical Conductivity @ 25 Deg. C | DP-1 | 12.3 | umhos/cm | 200 | 0 | none | N/A |

| Date/time of sample collection | Parameter | Sample Location | Result | Units | Benchmark | Magnitude of Benchmark Exceedance | Water Quality Objective | Magnitude of WQO Exceedance |
|---|---|---|---|---|---|---|---|---|
| 2/24/11 9:30 | Iron  Total | DP-1 | 0.753 | mg/L | 1 | 0 | 0.3 | 2.51 |
| 2/24/11 9:30 | Nitrite Plus Nitrate (as N) | DP-1 | 0.195 | mg/L | 0.68 | 0 | none | N/A |
| 2/24/11 9:30 | Oil and Grease | DP-1 | <11.1 | mg/L | 15 | 0 | none | N/A |
| 2/24/11 9:30 | pH | DP-1 | 6.35 | SU | 6.0-9.0 | 0 | 6.5-8.5 | 0.15 |
| 2/24/11 9:30 | Total Suspended Solids (TSS) | DP-1 | ,15 | mg/L | 100 | 0 | none | N/A |
| 2/24/11 9:30 | Zinc  Total | DP-1 | 0.335 | mg/L | 0.11 | 3.05 | 0.12 | 2.79 |
| 2/24/11 9:30 | Aluminum  Total | DP-2 | 0.652 | mg/L | 0.75 | 0 | none | N/A |
| 2/24/11 9:30 | Electrical Conductivity @ 25 Deg. C | DP-2 | 12.1 | umhos/cm | 200 | 0 | none | N/A |
| 2/24/11 9:30 | Iron  Total | DP-2 | 0.827 | mg/L | 1 | 0 | 0.3 | 2.76 |
| 2/24/11 9:30 | Nitrite Plus Nitrate (as N) | DP-2 | 0.205 | mg/L | 0.68 | 0 | none | N/A |
| 2/24/11 9:30 | Oil and Grease | DP-2 | <11.1 | mg/L | 15 | 0 | none | N/A |
| 2/24/11 9:30 | pH | DP-2 | 6.57 | SU | 6.0-9.0 | 0 | 6.5-8.5 | 0 |
| 2/24/11 9:30 | Total Suspended Solids (TSS) | DP-2 | ,15 | mg/L | 100 | 0 | none | N/A |
| 2/24/11 9:30 | Zinc  Total | DP-2 | 0.343 | mg/L | 0.11 | 3.12 | 0.12 | 2.86 |
| 5/25/11 12:20 | Aluminum  Total | DP-1 | 1.81 | mg/L | 0.75 | 2.41 | none | N/A |
| 5/25/11 12:20 | Electrical Conductivity @ 25 Deg. C | DP-1 | 89.3 | umhos/cm | 200 | 0 | none | N/A |
| 5/25/11 12:20 | Iron  Total | DP-1 | 2.63 | mg/L | 1 | 2.63 | 0.3 | 8.77 |
| 5/25/11 12:20 | Nitrite Plus Nitrate (as N) | DP-1 | 1.975 | mg/L | 0.68 | 2.90 | none | N/A |

| Date/time of sample collection | Parameter | Sample Location | Result | Units | Benchmark | Magnitude of Benchmark Exceedance | Water Quality Objective | Magnitude of WQO Exceedance |
|---|---|---|---|---|---|---|---|---|
| 5/25/11 12:20 | Oil and Grease | DP-1 | <12.2 | mg/L | 15 | 0 | none | N/A |
| 5/25/11 12:20 | pH | DP-1 | 6.63 | SU | 6.0-9.0 | 0 | 6.5-8.5 | 0 |
| 5/25/11 12:20 | Total Suspended Solids (TSS) | DP-1 | 52 | mg/L | 100 | 0 | none | N/A |
| 5/25/11 12:20 | Zinc  Total | DP-1 | 3.74 | mg/L | 0.11 | 34 | 0.12 | 31.17 |
| 5/25/11 12:20 | Aluminum  Total | DP-2 | 1.39 | mg/L | 0.75 | 1.85 | none | N/A |
| 5/25/11 12:20 | Electrical Conductivity @ 25 Deg. C | DP-2 | 82.2 | umhos/cm | 200 | 0 | none | N/A |
| 5/25/11 12:20 | Iron  Total | DP-2 | 1.92 | mg/L | 1 | 1.92 | 0.3 | 6.40 |
| 5/25/11 12:20 | Nitrite Plus Nitrate (as N) | DP-2 | 0.265 | mg/L | 0.68 | 0 | none | N/A |
| 5/25/11 12:20 | Oil and Grease | DP-2 | <11.1 | mg/L | 15 | 0 | none | N/A |
| 5/25/11 12:20 | pH | DP-2 | 6.34 | SU | 6.0-9.0 | 0 | 6.5-8.5 | 0.16 |
| 5/25/11 12:20 | Total Suspended Solids (TSS) | DP-2 | 35 | mg/L | 100 | 0 | none | N/A |
| 5/25/11 12:20 | Zinc  Total | DP-2 | 3.27 | mg/L | 0.11 | 29.73 | 0.12 | 27.25 |
| **2011/2012 Wet Season** | | | | | | | | |
| 10/10/11 10:55 | Aluminum  Total | DP-1 | 0.554 | mg/L | 0.75 | 0 | none | N/A |
| 10/10/11 10:55 | Electrical Conductivity @ 25 Deg. C | DP-1 | 24.3 | umhos/cm | 200 | 0 | none | N/A |
| 10/10/11 10:55 | Iron  Total | DP-1 | 0.854 | mg/L | 1 | 0 | 0.3 | 2.85 |
| 10/10/11 10:55 | Nitrite Plus Nitrate (as N) | DP-1 | 0.535 | mg/L | 0.68 | 0 | none | N/A |
| 10/10/11 10:55 | Oil and Grease | DP-1 | <10 | mg/L | 15 | 0 | none | N/A |

| Date/time of sample collection | Parameter | Sample Location | Result | Units | Benchmark | Magnitude of Benchmark Exceedance | Water Quality Objective | Magnitude of WQO Exceedance |
|---|---|---|---|---|---|---|---|---|
| 10/10/11 10:55 | pH | DP-1 | 6.95 | SU | 6.0-9.0 | 0 | 6.5-8.5 | 0 |
| 10/10/11 10:55 | Total Suspended Solids (TSS) | DP-1 | <15 | mg/L | 100 | 0 | none | N/A |
| 10/10/11 10:55 | Zinc  Total | DP-1 | 0.422 | mg/L | 0.11 | 3.84 | 0.12 | 3.52 |
| 10/10/11 10:55 | Aluminum  Total | DP-2 | 0.658 | mg/L | 0.75 | 0 | none | N/A |
| 10/10/11 10:55 | Electrical Conductivity @ 25 Deg. C | DP-2 | 23.9 | umhos/cm | 200 | 0 | none | N/A |
| 10/10/11 10:55 | Iron  Total | DP-2 | 0.927 | mg/L | 1 | 0 | 0.3 | 3.09 |
| 10/10/11 10:55 | Nitrite Plus Nitrate (as N) | DP-2 | 0.515 | mg/L | 0.68 | 0 | none | N/A |
| 10/10/11 10:55 | Oil and Grease | DP-2 | <10 | mg/L | 15 | 0 | none | N/A |
| 10/10/11 10:55 | pH | DP-2 | 6.79 | SU | 6.0-9.0 | 0 | 6.5-8.5 | 0 |
| 10/10/11 10:55 | Total Suspended Solids (TSS) | DP-2 | 16 | mg/L | 100 | 0 | none | N/A |
| 10/10/11 10:55 | Zinc  Total | DP-2 | 0.479 | mg/L | 0.11 | 4.35 | 0.12 | 3.99 |
| 3/14/12 8:30 | Aluminum  Total | DP-1 | 0.43 | mg/L | 0.75 | 0 | none | N/A |
| 3/14/12 8:30 | Electrical Conductivity @ 25 Deg. C | DP-1 | 22.3 | umhos/cm | 200 | 0 | none | N/A |
| 3/14/12 8:30 | Iron  Total | DP-1 | 0.576 | mg/L | 1 | 0 | 0.3 | 1.92 |
| 3/14/12 8:30 | Nitrite Plus Nitrate (as N) | DP-1 | 0.275 | mg/L | 0.68 | 0 | none | N/A |
| 3/14/12 8:30 | Oil and Grease | DP-1 | <11.4 | mg/L | 15 | 0 | none | N/A |
| 3/14/12 8:30 | pH | DP-1 | 6.96 | SU | 6.0-9.0 | 0 | 6.5-8.5 | 0 |
| 3/14/12 8:30 | Total Suspended Solids (TSS) | DP-1 | 15 | mg/L | 100 | 0 | none | N/A |

| Date/time of sample collection | Parameter | Sample Location | Result | Units | Benchmark | Magnitude of Benchmark Exceedance | Water Quality Objective | Magnitude of WQO Exceedance |
|---|---|---|---|---|---|---|---|---|
| 3/14/12 8:30 | Zinc Total | DP-1 | 0.377 | mg/L | 0.11 | 3.43 | 0.12 | 3.14 |
| 3/14/12 8:30 | Aluminum Total | DP-2 | 0.467 | mg/L | 0.75 | 0 | none | N/A |
| 3/14/12 8:30 | Electrical Conductivity @ 25 Deg. C | DP-2 | 20 | umhos/cm | 200 | 0 | none | N/A |
| 3/14/12 8:30 | Iron Total | DP-2 | 0.671 | mg/L | 1 | 0 | 0.3 | 2.24 |
| 3/14/12 8:30 | Nitrite Plus Nitrate (as N) | DP-2 | 0.265 | mg/L | 0.68 | 0 | none | N/A |
| 3/14/12 8:30 | Oil and Grease | DP-2 | <10 | mg/L | 15 | 0 | none | N/A |
| 3/14/12 8:30 | pH | DP-2 | 6.73 | SU | 6.0-9.0 | 0 | 6.5-8.5 | 0 |
| 3/14/12 8:30 | Total Suspended Solids (TSS) | DP-2 | <15 | mg/L | 100 | 0 | none | N/A |
| 3/14/12 8:30 | Zinc Total | DP-2 | 0.368 | mg/L | 0.11 | 3.35 | 0.12 | 3.07 |
| **2012/2013 Wet Season** | | | | | | | | |
| 11/8/12 2:59 | Aluminum Total | DP-2 | 0.767 | mg/L | 0.75 | 1.02 | none | N/A |
| 11/8/12 2:59 | Electrical Conductivity @ 25 Deg. C | DP-2 | 53.2 | umhos/cm | 200 | 0 | none | N/A |
| 11/8/12 2:59 | Iron Total | DP-2 | 1.1 | mg/L | 1 | 1.1 | 0.3 | 3.67 |
| 11/8/12 2:59 | Nitrite Plus Nitrate (as N) | DP-2 | 0.815 | mg/L | 0.68 | 1.20 | none | N/A |
| 11/8/12 2:59 | Oil and Grease | DP-2 | <10 | mg/L | 15 | 0 | none | N/A |
| 11/8/12 2:59 | pH | DP-2 | 6.75 | SU | 6.0-9.0 | 0 | 6.5-8.5 | 0 |
| 11/8/12 2:59 | Total Suspended Solids (TSS) | DP-2 | 20 | mg/L | 100 | 0 | none | N/A |
| 11/8/12 2:59 | Zinc Total | DP-2 | 0.674 | mg/L | 0.11 | 6.13 | 0.12 | 5.62 |

| Date/time of sample collection | Parameter | Sample Location | Result | Units | Benchmark | Magnitude of Benchmark Exceedance | Water Quality Objective | Magnitude of WQO Exceedance |
|---|---|---|---|---|---|---|---|---|
| 11/8/12 3:09 | Aluminum Total | DP-1 | 1.07 | mg/L | 0.75 | 1.43 | none | N/A |
| 11/8/12 3:09 | Electrical Conductivity @ 25 Deg. C | DP-1 | 76.8 | umhos/cm | 200 | 0 | none | N/A |
| 11/8/12 3:09 | Iron Total | DP-1 | 1.45 | mg/L | 1 | 1.45 | 0.3 | 4.83 |
| 11/8/12 3:09 | Nitrite Plus Nitrate (as N) | DP-1 | 1.045 | mg/L | 0.68 | 1.54 | none | N/A |
| 11/8/12 3:09 | Oil and Grease | DP-1 | <10.5 | mg/L | 15 | 0 | none | N/A |
| 11/8/12 3:09 | pH | DP-1 | 6.55 | SU | 6.0-9.0 | 0 | 6.5-8.5 | 0 |
| 11/8/12 3:09 | Total Suspended Solids (TSS) | DP-1 | 38 | mg/L | 100 | 0 | none | N/A |
| 11/8/12 3:09 | Zinc Total | DP-1 | 0.626 | mg/L | 0.11 | 5.69 | 0.12 | 5.22 |
| 11/8/12 3:50 | Aluminum Total | SP-1 | 1.32 | mg/L | 0.75 | 1.76 | none | N/A |
| 11/8/12 3:50 | Electrical Conductivity @ 25 Deg. C | SP-1 | 137 | umhos/cm | 200 | 0 | none | N/A |
| 11/8/12 3:50 | Iron Total | SP-1 | 1.57 | mg/L | 1 | 1.57 | 0.3 | 5.23 |
| 11/8/12 3:50 | Nitrite Plus Nitrate (as N) | SP-1 | 1.71 | mg/L | 0.68 | 2.51 | none | N/A |
| 11/8/12 3:50 | Oil and Grease | SP-1 | <11.1 | mg/L | 15 | 0 | none | N/A |
| 11/8/12 3:50 | pH | SP-1 | 7.74 | SU | 6.0-9.0 | 0 | 6.5-8.5 | 0 |
| 11/8/12 3:50 | Total Suspended Solids (TSS) | SP-1 | 21 | mg/L | 100 | 0 | none | N/A |
| 11/8/12 3:50 | Zinc Total | SP-1 | 1.6 | mg/L | 0.11 | 14.55 | 0.12 | 13.33 |
| 4/4/13 7:50 | Aluminum Total | SP-1 | 0.915 | mg/L | 0.75 | 1.22 | none | N/A |
| 4/4/13 7:50 | Electrical Conductivity @ 25 Deg. C | SP-1 | 120 | umhos/cm | 200 | 0 | none | N/A |

| Date/time of sample collection | Parameter | Sample Location | Result | Units | Benchmark | Magnitude of Benchmark Exceedance | Water Quality Objective | Magnitude of WQO Exceedance |
|---|---|---|---|---|---|---|---|---|
| 4/4/13 7:50 | Iron  Total | SP-1 | 1.14 | mg/L | 1 | 1.14 | 0.3 | 3.80 |
| 4/4/13 7:50 | Nitrite Plus Nitrate (as N) | SP-1 | 0.905 | mg/L | 0.68 | 1.33 | none | N/A |
| 4/4/13 7:50 | Oil and Grease | SP-1 | <19.6 | mg/L | 15 | 0.00 | none | N/A |
| 4/4/13 7:50 | pH | SP-1 | 7.5 | SU | 6.0-9.0 | 0 | 6.5-8.5 | 0 |
| 4/4/13 7:50 | Total Suspended Solids (TSS) | SP-1 | 56 | mg/L | 100 | 0 | none | N/A |
| 4/4/13 7:50 | Zinc  Total | SP-1 | 2.72 | mg/L | 0.11 | 24.73 | 0.12 | 22.67 |
| 4/4/13 8:10 | Aluminum  Total | DP-1 | 0.416 | mg/L | 0.75 | 0 | none | N/A |
| 4/4/13 8:10 | Electrical Conductivity @ 25 Deg. C | DP-1 | 33.5 | umhos/cm | 200 | 0 | none | N/A |
| 4/4/13 8:10 | Iron  Total | DP-1 | 0.506 | mg/L | 1 | 0 | 0.3 | 1.69 |
| 4/4/13 8:10 | Nitrite Plus Nitrate (as N) | DP-1 | 0.485 | mg/L | 0.68 | 0 | none | N/A |
| 4/4/13 8:10 | Oil and Grease | DP-1 | <18.2 | mg/L | 15 | 0 | none | N/A |
| 4/4/13 8:10 | pH | DP-1 | 6.79 | SU | 6.0-9.0 | 0 | 6.5-8.5 | 0 |
| 4/4/13 8:10 | Total Suspended Solids (TSS) | DP-1 | <15 | mg/L | 100 | 0 | none | N/A |
| 4/4/13 8:10 | Zinc  Total | DP-1 | 0.343 | mg/L | 0.11 | 3.12 | 0.12 | 2.86 |
| 4/4/13 8:25 | Aluminum  Total | DP-2 | 0.287 | mg/L | 0.75 | 0 | none | N/A |
| 4/4/13 8:25 | Electrical Conductivity @ 25 Deg. C | DP-2 | 14.2 | umhos/cm | 200 | 0 | none | N/A |
| 4/4/13 8:25 | Iron  Total | DP-2 | 0.37 | mg/L | 1 | 0 | 0.3 | 1.23 |
| 4/4/13 8:25 | Nitrite Plus Nitrate (as N) | DP-2 | 0.305 | mg/L | 0.68 | 0 | none | N/A |

| Date/time of sample collection | Parameter | Sample Location | Result | Units | Benchmark | Magnitude of Benchmark Exceedance | Water Quality Objective | Magnitude of WQO Exceedance |
|---|---|---|---|---|---|---|---|---|
| 4/4/13 8:25 | Oil and Grease | DP-2 | 16 | mg/L | 15 | 1.07 | none | N/A |
| 4/4/13 8:25 | pH | DP-2 | 6.53 | SU | 6.0-9.0 | 0 | 6.5-8.5 | 0 |
| 4/4/13 8:25 | Total Suspended Solids (TSS) | DP-2 | <15 | mg/L | 100 | 0 | none | N/A |
| 4/4/13 8:25 | Zinc Total | DP-2 | 0.449 | mg/L | 0.11 | 4.08 | 0.12 | 3.74 |
| **2013/2014 Wet Season** | | | | | | | | |
| 3/25/14 7:15 | Nitrite Plus Nitrate (as N) | DP-1 | 1.385 | mg/L | 0.68 | 2.04 | none | N/A |
| 3/25/14 7:15 | Oil and Grease | DP-1 | <11.1 | mg/L | 15 | 0 | none | N/A |
| 3/25/14 7:15 | Electrical Conductivity @ 25 Deg. C | DP-1 | 93.1 | umhos/cm | 200 | 0 | none | N/A |
| 3/25/14 7:15 | pH | DP-1 | 7.85 | SU | 6.0-9.0 | 0 | 6.5-8.5 | 0 |
| 3/25/14 7:15 | Total Suspended Solids (TSS) | DP-1 | 46 | mg/L | 100 | 0 | none | N/A |
| 3/25/14 7:15 | Aluminum Total | DP-1 | 1.66 | mg/L | 0.75 | 2.21 | none | N/A |
| 3/25/14 7:15 | Iron Total | DP-1 | 2.38 | mg/L | 1 | 2.38 | 0.3 | 7.93 |
| 3/25/14 7:15 | Zinc Total | DP-1 | 1.17 | mg/L | 0.11 | 10.64 | 0.12 | 9.75 |
| 3/25/14 7:30 | Nitrite Plus Nitrate (as N) | DP-2 | 1.385 | mg/L | 0.68 | 2.04 | none | N/A |
| 3/25/14 7:30 | Oil and Grease | DP-2 | <10.9 | mg/L | 15 | 0 | none | N/A |
| 3/25/14 7:30 | Electrical Conductivity @ 25 Deg. C | DP-2 | 92.1 | umhos/cm | 200 | 0 | none | N/A |
| 3/25/14 7:30 | pH | DP-2 | 7.72 | SU | 6.0-9.0 | 0 | 6.5-8.5 | 0 |
| 3/25/14 7:30 | Total Suspended Solids (TSS) | DP-2 | 43 | mg/L | 100 | 0 | none | N/A |

| Date/time of sample collection | Parameter | Sample Location | Result | Units | Benchmark | Magnitude of Benchmark Exceedance | Water Quality Objective | Magnitude of WQO Exceedance |
|---|---|---|---|---|---|---|---|---|
| 3/25/14 7:30 | Aluminum Total | DP-2 | 2.17 | mg/L | 0.75 | 2.89 | none | N/A |
| 3/25/14 7:30 | Zinc Total | DP-2 | 1.16 | mg/L | 0.11 | 10.55 | 0.12 | 9.67 |
| 3/25/14 7:30 | Iron Total | DP-2 | 2.57 | mg/L | 1 | 2.57 | 0.3 | 8.57 |
| 3/25/14 7:45 | Nitrite Plus Nitrate (as N) | SP-1 | 1.84 | mg/L | 0.68 | 2.71 | none | N/A |
| 3/25/14 7:45 | Oil and Grease | SP-1 | <11.1 | mg/L | 15 | 0 | none | N/A |
| 3/25/14 7:45 | Electrical Conductivity @ 25 Deg. C | SP-1 | 171 | umhos/cm | 200 | 0 | none | N/A |
| 3/25/14 7:45 | pH | SP-1 | 8.8 | SU | 6.0-9.0 | 0 | 6.5-8.5 | 0.3 |
| 3/25/14 7:45 | Total Suspended Solids (TSS) | SP-1 | 72 | mg/L | 100 | 0 | none | N/A |
| 3/25/14 7:45 | Aluminum Total | SP-1 | 2.88 | mg/L | 0.75 | 3.84 | none | N/A |
| 3/25/14 7:45 | Zinc Total | SP-1 | 4.9 | mg/L | 0.11 | 44.55 | 0.12 | 40.83 |
| 3/25/14 7:45 | Iron Total | SP-1 | 3.89 | mg/L | 1 | 3.89 | 0.3 | 12.97 |
| 4/25/14 13:00 | Nitrite Plus Nitrate (as N) | DP-1 | 1.355 | mg/L | 0.68 | 1.99 | none | N/A |
| 4/25/14 13:00 | Oil and Grease | DP-1 | <10 | mg/L | 15 | 0 | none | N/A |
| 4/25/14 13:00 | Electrical Conductivity @ 25 Deg. C | DP-1 | Did not analyze | umhos/cm | 200 | N/A | none | N/A |
| 4/25/14 13:00 | pH | DP-1 | 6.9 | SU | 6.0-9.0 | 0 | 6.5-8.5 | 0 |
| 4/25/14 13:00 | Total Suspended Solids (TSS) | DP-1 | 28 | mg/L | 100 | 0 | none | N/A |
| 4/25/14 13:00 | Zinc Total | DP-1 | 1.4 | mg/L | 0.11 | 12.73 | 0.12 | 11.67 |
| 4/25/14 13:00 | Iron Total | DP-1 | 3.87 | mg/L | 1 | 3.87 | 0.3 | 12.90 |

| Date/time of sample collection | Parameter | Sample Location | Result | Units | Benchmark | Magnitude of Benchmark Exceedance | Water Quality Objective | Magnitude of WQO Exceedance |
|---|---|---|---|---|---|---|---|---|
| 4/25/14 13:00 | Aluminum Total | DP-1 | 2.53 | mg/L | 0.75 | 3.37 | none | N/A |
| 4/25/14 13:15 | Nitrite Plus Nitrate (as N) | DP-2 | 0.935 | mg/L | 0.68 | 1.38 | none | N/A |
| 4/25/14 13:15 | Oil and Grease | DP-2 | <10 | mg/L | 15 | 0 | none | N/A |
| 4/25/14 13:15 | Electrical Conductivity @ 25 Deg. C | DP-2 | Did not analyze | umhos/cm | 200 | N/A | none | N/A |
| 4/25/14 13:15 | pH | DP-2 | 7.23 | SU | 6.0-9.0 | 0 | 6.5-8.5 | 0 |
| 4/25/14 13:15 | Total Suspended Solids (TSS) | DP-2 | <15 | mg/L | 100 | 0 | none | N/A |
| 4/25/14 13:15 | Aluminum Total | DP-2 | 1.57 | mg/L | 0.75 | 2.09 | none | N/A |
| 4/25/14 13:15 | Zinc Total | DP-2 | 0.991 | mg/L | 0.11 | 9.01 | 0.12 | 8.26 |
| 4/25/14 13:15 | Iron Total | DP-2 | 2.76 | mg/L | 1 | 2.76 | 0.3 | 9.20 |
| 4/25/14 13:30 | Nitrite Plus Nitrate (as N) | SP-1 | 1.035 | mg/L | 0.68 | 1.52 | none | N/A |
| 4/25/14 13:30 | Oil and Grease | SP-1 | <10 | mg/L | 15 | 0 | none | N/A |
| 4/25/14 13:30 | Electrical Conductivity @ 25 Deg. C | SP-1 | Did not analyze | umhos/cm | 200 | N/A | none | N/A |
| 4/25/14 13:30 | pH | SP-1 | 7.1 | SU | 6.0-9.0 | 0 | 6.5-8.5 | 0 |
| 4/25/14 13:30 | Total Suspended Solids (TSS) | SP-1 | 109 | mg/L | 100 | 1.09 | none | N/A |
| 4/25/14 13:30 | Aluminum Total | SP-1 | 7.38 | mg/L | 0.75 | 9.84 | none | N/A |
| 4/25/14 13:30 | Zinc Total | SP-1 | 6.03 | mg/L | 0.11 | 54.82 | 0.12 | 50.25 |
| 4/25/14 13:30 | Iron Total | SP-1 | 11.3 | mg/L | 1 | 11.3 | 0.3 | 37.67 |
| | | | | | **Total Benchmark Exceedances** | **71** | **Total WQO Exceedances** | **52** |

**Exhibit B**

| Arcade Creek at Winding Way Gauge | | |
|---|---|---|
| Date | Day of Week | Rain |
| 1/12/10 | Tuesday | 0.47 |
| 1/17/10 | Sunday | 0.32 |
| 1/21/10 | Thursday | 0.55 |
| 1/25/10 | Monday | 0.32 |
| 1/29/10 | Friday | 0.24 |
| 2/4/10 | Thursday | 0.7 |
| 2/6/10 | Saturday | 0.16 |
| 2/8/10 | Sunday | 0.12 |
| 2/23/10 | Tuesday | 0.59 |
| 2/26/10 | Friday | 0.47 |
| 2/27/10 | Saturday | 0.31 |
| 3/2/10 | Tuesday | 0.28 |
| 3/3/10 | Wednesday | 0.63 |
| 3/9/10 | Tuesday | 0.12 |
| 3/12/10 | Friday | 0.39 |
| 3/31/10 | Wednesday | 0.15 |
| 4/4/10 | Sunday | 0.75 |
| 4/11/10 | Sunday | 0.51 |
| 4/12/10 | Monday | 0.31 |
| 4/20/10 | Tuesday | 0.31 |
| 4/21/10 | Wednesday | 0.16 |
| 4/27/10 | Tuesday | 0.16 |
| 5/10/10 | Monday | 0.19 |
| 5/25/10 | Tuesday | 0.24 |
| 5/27/10 | Thursday | 0.16 |
| 10/23/10 | Saturday | 0.59 |
| 10/24/10 | Sunday | 0.48 |
| 11/7/10 | Sunday | 0.32 |
| 11/19/10 | Friday | 0.78 |
| 11/20/10 | Saturday | 0.83 |
| 11/27/10 | Saturday | 0.24 |
| 12/2/10 | Thursday | 0.24 |
| 12/4/10 | Saturday | 0.28 |
| 12/5/10 | Sunday | 0.59 |
| 12/8/10 | Wednesday | 0.11 |
| 12/14/10 | Tuesday | 0.16 |
| 12/17/10 | Friday | 0.55 |
| 12/18/10 | Saturday | 0.36 |
| 12/19/10 | Sunday | 0.28 |
| 12/21/10 | Tuesday | 0.16 |

| Date | Day of Week | Rain |
|---|---|---|
| 12/22/10 | Wednesday | 0.11 |
| 12/25/10 | Saturday | 0.71 |
| 12/28/10 | Tuesday | 0.55 |
| 1/1/11 | Saturday | 0.24 |
| 1/2/11 | Sunday | 0.24 |
| 1/13/11 | Thursday | 0.11 |
| 1/29/11 | Saturday | 0.2 |
| 1/30/11 | Sunday | 0.23 |
| 2/15/11 | Tuesday | 0.2 |
| 2/16/11 | Wednesday | 0.16 |
| 2/17/11 | Thursday | 0.47 |
| 2/18/11 | Friday | 0.55 |
| 2/24/11 | Thursday | 0.71 |
| 2/25/11 | Friday | 0.32 |
| 3/5/11 | Saturday | 0.11 |
| 3/6/11 | Sunday | 0.31 |
| 3/13/11 | Sunday | 0.75 |
| 3/14/11 | Monday | 0.19 |
| 3/15/11 | Tuesday | 0.63 |
| 3/18/11 | Friday | 0.63 |
| 3/19/11 | Saturday | 0.28 |
| 3/20/11 | Sunday | 0.36 |
| 3/23/11 | Wednesday | 0.27 |
| 3/24/11 | Thursday | 0.63 |
| 3/25/11 | Friday | 0.12 |
| 3/26/11 | Saturday | 0.27 |
| 5/15/11 | Sunday | 0.31 |
| 5/16/11 | Monday | 0.24 |
| 5/17/11 | Tuesday | 0.47 |
| 5/18/11 | Wednesday | 0.12 |
| 5/25/11 | Wednesday | 0.27 |
| 5/28/11 | Saturday | 0.2 |
| 6/1/11 | Wednesday | 0.12 |
| 6/4/11 | Saturday | 0.36 |
| 6/28/11 | Tuesday | 0.55 |
| 10/4/11 | Tuesday | 0.28 |
| 10/5/11 | Wednesday | 0.16 |
| 10/10/11 | Monday | 0.55 |
| 11/5/11 | Saturday | 0.31 |
| 11/19/11 | Saturday | 0.2 |
| 11/20/11 | Sunday | 0.12 |

| Date | Day of Week | Rain |
|---|---|---|
| 11/24/11 | Thursday | 0.11 |
| 1/19/12 | Thursday | 0.28 |
| 1/20/12 | Friday | 0.94 |
| 1/22/12 | Sunday | 0.47 |
| 1/23/12 | Monday | 0.23 |
| 2/12/12 | Sunday | 0.24 |
| 2/29/12 | Wednesday | 0.12 |
| 3/13/12 | Tuesday | 0.31 |
| 3/14/12 | Wednesday | 0.4 |
| 3/16/12 | Friday | 0.67 |
| 3/17/12 | Saturday | 0.28 |
| 3/25/12 | Sunday | 0.16 |
| 3/27/12 | Tuesday | 0.87 |
| 3/28/12 | Wednesday | 0.12 |
| 3/31/12 | Saturday | 0.43 |
| 4/11/12 | Wednesday | 0.51 |
| 4/12/12 | Thursday | 0.67 |
| 4/13/12 | Friday | 0.23 |
| 4/25/12 | Wednesday | 0.55 |
| 10/22/12 | Monday | 0.35 |
| 10/31/12 | Wednesday | 0.16 |
| 11/1/12 | Thursday | 0.19 |
| 11/8/12 | Thursday | 0.12 |
| 11/16/12 | Friday | 0.16 |
| 11/17/12 | Saturday | 0.48 |
| 11/20/12 | Monday | 0.2 |
| 11/21/12 | Tuesday | 0.19 |
| 11/28/12 | Wednesday | 0.4 |
| 11/29/12 | Thursday | 0.51 |
| 11/30/12 | Friday | 0.39 |
| 12/1/12 | Saturday | 0.44 |
| 12/2/12 | Sunday | 0.36 |
| 12/4/12 | Tuesday | 0.31 |
| 12/5/12 | Wednesday | 0.16 |
| 12/13/12 | Thursday | 0.15 |
| 12/15/12 | Saturday | 0.12 |
| 12/17/12 | Monday | 0.27 |
| 12/21/12 | Friday | 0.36 |
| 12/22/12 | Saturday | 0.31 |
| 12/23/12 | Sunday | 0.47 |
| 12/25/12 | Tuesday | 0.63 |

| Date | Day of Week | Rain |
|---|---|---|
| 1/5/13 | Saturday | 0.59 |
| 1/6/13 | Sunday | 0.12 |
| 1/23/13 | Wednesday | 0.12 |
| 2/19/13 | Tuesday | 0.2 |
| 3/6/13 | Wednesday | 0.16 |
| 3/19/13 | Tuesday | 0.2 |
| 3/20/13 | Wednesday | 0.24 |
| 3/30/13 | Saturday | 0.12 |
| 3/31/13 | Sunday | 0.35 |
| 4/4/13 | Thursday | 0.39 |
| 6/24/13 | Monday | 0.12 |
| 9/2/13 | Monday | 0.11 |
| 9/21/13 | Saturday | 0.28 |
| 11/19/13 | Tuesday | 0.55 |
| 11/20/13 | Wednesday | 0.28 |
| 12/6/13 | Friday | 0.47 |
| 12/7/13 | Saturday | 0.12 |
| 1/29/14 | Wednesday | 0.16 |
| 1/30/14 | Thursday | 0.47 |
| 2/5/14 | Wednesday | 0.12 |
| 2/6/14 | Thursday | 0.12 |
| 2/7/14 | Friday | 0.4 |
| 2/11/14 | Tuesday | 2.21 |
| 2/26/14 | Wednesday | 0.47 |
| 2/28/14 | Friday | 0.71 |
| 3/2/14 | Sunday | 0.16 |
| 3/3/14 | Monday | 0.16 |
| 3/5/14 | Wednesday | 0.47 |
| 3/10/14 | Monday | 0.2 |
| 3/26/14 | Wednesday | 0.4 |
| 3/29/14 | Saturday | 0.47 |
| 3/31/14 | Monday | 0.16 |
| 4/1/14 | Tuesday | 0.59 |
| 4/25/14 | Friday | 0.59 |
| 9/25/14 | Thursday | 0.28 |
| 9/26/14 | Friday | 0.16 |
| 12/8/14 | Monday | 4.61 |
| 12/11/14 | Thursday | 0.75 |
| 12/12/14 | Friday | 0.15 |
| 12/15/14 | Monday | 0.35 |
| 12/16/14 | Tuesday | 0.55 |

| Date | Day of Week | Rain |
|---|---|---|
| 12/17/14 | Wednesday | 0.12 |
| 12/19/14 | Friday | 0.44 |
| | **Total Number of Rain Days** | **165** |